# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**WELLS FARGO & COMPANY**, a Delaware corporation, **WFC HOLDINGS CORPORATION**, a Delaware corporation, and **QUICKEN LOANS, INC.**, a Michigan corporation

        Plaintiff,

vs.

**WHENU.COM, INC.**, a Delaware corporation

        Defendant.

_____ /

Case No. 03-71906

Hon. Nancy G. Edmunds
Magistrate Judge Pepe

**FILED**

JUN 23 2003

CLERK'S OFFICE
U.S. DISTRICT COURT
EASTERN MICHIGAN

## MEMORANDUM OF DEFENDANT WHENU.COM, INC. IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

13

## CONTROLLING/MOST APPROPRIATE AUTHORITY

*Interactive Prods. Corp. v. A2Z Mobile Office Solutions, Inc.*, 326 F.3d 687, 695 (6th Cir. 2003)

## CONCISE STATEMENT OF ISSUE PRESENTED

Whether this court should issue a preliminary injunction where plaintiffs have failed to show (1) there is a substantial likelihood they will prevail on the merits, (2) they will suffer irreparable harm absent an injunction, (3) the issuance of an injunction would not cause greater harm to others (including Defendant) than the absence of an injunction, and (4) issuance of an injunction would serve the public interest.

## Preliminary Statement

Everyone loves the free market -- until the competition shows up. Plaintiffs Wells Fargo & Company ("Wells Fargo"), WFC Holdings Corporation and Quicken Loans Inc. ("Quicken") happily exploit the World Wide Web for their own commercial purposes. To that end, they have established websites and spent "considerable" sums on various advertising arrangements designed to "drive" web-traffic to those sites. Complaint, ¶¶ 78-81. But plaintiffs are not alone in cyberspace. Rival companies have also embraced the Web, using internet technology to advertise and offer competing products and services. Thus, today's computer technology (and the free market) enables consumers to comparison shop freely and easily while browsing the Web – even while viewing content from the plaintiffs' websites.

Defendant WhenU.com ("WhenU") is a marketing company that delivers online advertisements and money-saving offers to participating consumers. Consumers download WhenU's proprietary software from the Internet, generally as part of a package of revenue-generating software that supports a free software product. WhenU's software then scans the Internet activity of these consumers, and determines whether it has a relevant offer to display. If it does, the offer is displayed on the participating consumer's computer screen in a separate window that is conspicuously branded with a WhenU mark or logo. In this manner, WhenU delivers contextually relevant advertisements, *i.e.*, advertisements that are designed to reach the consumer at the exact moment in time that the information is most relevant to him.

The plaintiffs do not like the fact that consumers who have decided to download WhenU's software can receive information from the plaintiffs' competitors while accessing content from the plaintiffs' websites, and are attempting to use the copyright and trademark laws

to gain control over what individual computer users can see on their computer screens while viewing plaintiffs' websites. Plaintiffs' theory is obviously aimed at stifling competition. But it also threatens to impose drastic limits on how people use their computers. If accepted, plaintiffs' reasoning could make displaying two or more websites in overlapping windows on the same computer screen, or the use of common and useful applications like appointments software or instant messaging, violations of federal law.

Plaintiffs' motion for a preliminary injunction should be denied. Plaintiffs lack any legal basis for relief on the merits. The nearly eight-month delay between plaintiffs' discovery of WhenU's service and this motion makes a mockery of plaintiffs' allegations of irreparable harm. An injunction would also do severe damage to WhenU and to the public interest, which benefits from the development of innovative Internet-enabled software.

**Statement of Facts**

**The Business of WhenU**

WhenU is a three-year old marketing company that provides participating consumers with information about products and services through SaveNow, a proprietary software product. Once downloaded from the Internet,[1] the SaveNow program resides on participating consumers' computers as a software application separate and apart from the Web browser software

---

[1] Prior to downloading SaveNow, the user must accept a license agreement that describes the software, and explains how to uninstall it. SaveNow is typically downloaded as part of a "bundle" of other software applications. Software companies routinely bundle revenue-generating, advertising software ("adware") with free programs ("freeware") in order to offer the freeware at no cost. Developers of freeware, including WhenU, rely on the revenue generated by adware to enable them to offer their software free of charge. Naider Aff. ¶ 37.

application.[2]  When a participating consumer browses the Internet, the SaveNow software scans the activity conducted within the Internet browser to assess his immediate interests.  Based on a proprietary analysis of that activity, the SaveNow software displays relevant advertisements in a separate and distinct WhenU-branded window on his computer screen (or "desktop").  For example, if a WhenU user were to do a search using the name of a mortgage provider, type the web address of a mortgage company into his Internet browser, or access a webpage containing a certain number of mortgage-related keywords, the software might determine that he is interested in mortgages, and display an advertisement for a competing financial services company.  Naider Aff. ¶¶ 7, 30-33.

Consumers using SaveNow benefit by receiving advertisements for products and services at the point in time this information is most relevant to them.  They also benefit from the coupons delivered to them via SaveNow, which offer them a variety of opportunities to save money.  And they obtain these services without cost, and without sacrificing their privacy. (WhenU abides by a privacy policy that far exceeds current standards in the Internet advertising industry.)  Advertisers also benefit by obtaining access to potential customers who have already expressed interest in the type of product or service that the advertiser offers.  Naider Aff. ¶¶ 23, 27, 55.

The mechanism by which WhenU matches consumer interests to relevant advertisements is a proprietary directory of the Internet.  This directory was compiled by a team of WhenU researchers who sorted commonly used search phrases, commonly visited web addresses (or

---

[2] A Web browser is an application such as Netscape Navigator or Microsoft's Internet Explorer that allows users to request and display information stored on Web servers.  Reinhold Dec. ¶ 20.

"URLs")[3], and various "keyword algorithms" into different categories. The WhenU directory contains more than 40,000 such elements, which are organized into more than 500 product or service categories (such as "finance") and sub-categories (such as "mortgages").  Naider Aff. ¶¶ 28-29.

When a consumer decides to install the SaveNow software, the WhenU directory is delivered to and saved on that consumer's hard drive.  Thereafter, when that consumer browses the Internet, the software constantly studies the search terms, web addresses, and page content that the consumer accesses to determine whether the consumer is interested in one of the product or service categories contained in the WhenU directory.  If the software determines that the consumer is interested in a particular category (*e.g.*, finance.mortgages), it then determines whether that consumer should receive an advertisement that is selected from among available advertisements suitable to the category of user activity.  Naider Aff. ¶ 30.

In compiling its proprietary directory, WhenU indexes product names and web addresses into various categories in much the same way that a local Yellow Pages indexes merchants. WhenU does not "sell" individual web addresses to its advertising clients, and does not guarantee to any advertiser that its advertisements will be shown when a participating consumer views content from a particular website.  The inclusion of common search terms and web

---

[3] Every website has an address, called a domain name.  Each page of the website has an identifier called a uniform resource locator or "URL."  The domain name is generally included in the URL. For example, "wellsfargo.com" is a domain name; "http://www.wellsfargo.com" is a URL. Reinhold Dec. ¶ 22.  Domain names and URLs may contain trademarked terms.  The domain name itself may also be trademarked, but only if it is used as a trademark as well as an address. Plaintiffs do not claim to have registered WellsFargo.com or Quicken.com as trademarks.

addresses in the directory is done solely to determine a particular category of consumer interest. Naider Aff. ¶¶ 35-36.

WhenU advertisements are not sent "to," nor do they reside "on" plaintiffs' websites. A website appears in one window on the user's computer's screen; a WhenU advertisement appears in another. It is possible for a computer user to have many windows open at the same time, including windows displaying multiple websites. Indeed, it is inaccurate to describe *any* website as being "on" a particular user's computer desktop. All that exists on a person's computer screen is an image generated by the user's web browser based on instructions received from a website residing on an outside server. The website itself is not transferred to the user's computer. It remains resident on its own server where it is protected from tampering by "firewalls" and other internet security mechanisms. Reinhold Dec. ¶¶ 41-47.

Finally, contrary to the plaintiffs' allegations, WhenU does not "hijack" consumers away from the plaintiffs' websites. A consumer receiving a SaveNow advertisement is not directed to the advertiser's website unless he makes the affirmative choice to click on the appropriate portion of the SaveNow offer.[4] Even if the consumer chooses to access the site designated in the advertiser's offer, the plaintiffs' website remains easily accessible to the consumer via the back button on his open Internet browser window. Naider Aff. ¶ 52.

**The Effect of an Injunction**

A preliminary injunction would have devastating effects on WhenU. WhenU's business model revolves around the ability of its software to display contextually relevant advertisements.

---

[4] Accurate screenshots of WhenU advertisements are submitted with the accompanying affidavit of Avi Naider. *See* Naider Aff., Exs. L, M, N. Three of the four screenshots included in plaintiffs' papers are not accurate depictions of WhenU advertisements. *See* Naider Aff. ¶ 49.

In its relatively short history, WhenU has fostered advertising relationships with over 400 online advertisers. The entry of a preliminary injunction would threaten these relationships and disrupt WhenU's ability to obtain new advertisers by intimidating companies who would otherwise be interested in such advertising.

An injunction would also deprive SaveNow users of access to useful information about products and services that they would have received absent the injunction. Naider Aff. ¶ 59. For example, plaintiffs assert that many of their customers are unsophisticated, first-time mortgage buyers. Motion, p. 14. These are the consumers who would benefit the most from learning about the availability of competing mortgage products through WhenU. *See generally* Deighton Dec. ¶ 8.

Moreover, compliance with the requested injunction could disrupt WhenU's entire business. Even if WhenU were to modify its software to block the plaintiffs' URLs, SaveNow advertisements may launch in response to a variety of searches conducted by participating consumers, or by activity in other Internet browser windows that a consumer may have open at the same time as the plaintiffs' websites. If the appearance of advertisements in these circumstances were deemed to constitute noncompliance with an injunction, WhenU might have to cease operation altogether. Naider Aff. ¶¶ 56-59.

## ARGUMENT

A preliminary injunction is an "extraordinary remedy" that should be granted only if "the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). In considering whether to issue a preliminary injunction, the court must consider four factors: "(1) whether the movant has shown a strong likelihood of

success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction." *Id.* The movant carries the burden of proving that the circumstances "clearly demand" the entry of injunctive relief. *Id.*

Although the four factors are to be balanced against each other, *id.*, a preliminary injunction may not issue if there is no likelihood of success on the merits, regardless of the other three factors. [5] *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997). In addition, a movant always must demonstrate that "'failure to issue the injunction is likely to result in irreparable harm.'" *United States v. Miami Univ.*, 294 F.3d 797, 816 (6th Cir. 2002) (quoting *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1068 (6th Cir. 1998)).

Plaintiffs have failed to meet the demanding standard required to show entitlement to preliminary injunctive relief.[6]

---

[5] Plaintiffs only purport to establish a "likelihood" of success on the merits. *See, e.g.*, Motion, pp. 7-8, 14, 17-20 However, in this Circuit, a preliminary injunction may not issue absent a "strong likelihood" of success on the merits. *See, e.g., Overstreet*, 305 F.3d at 573; *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998). Further, plaintiffs have not made any attempt to demonstrate likelihood of success on their claims for unfair competition under the Lanham Act or under Michigan statutory or common law.

[6] The entry of an order in the *WashingtonPost.Newsweek Interactive Co. v. The Gator Corp.*, No. 02-909-A (E.D. Va. filed June 25, 2002), does not help plaintiffs in this case. Motion, pp. 7-8. That case involved different circumstances, different parties and a different service.

I.    **PLAINTIFFS ARE NOT LIKELY TO SUCCEED IN SHOWING THAT WHENU HAS INFRINGED THEIR TRADEMARKS**

    A.    **WhenU Does Not Employ the Plaintiffs' Marks to Identify the Products or Services Advertised by WhenU and Therefore Does Not Use the Plaintiffs' Marks in Commerce, a Prerequisite to Liability Under the Lanham Act**

The Lanham Act does not forbid any use of a trademark. It only forbids the "use in commerce" of a registered mark "in connection with" the sale, distribution or advertising of goods or services. 15 U.S.C. § 1114(1)(a). *See also* 15 U.S.C. § 1127 (a trademark is deemed to be used in commerce only "when it is used or displayed in the sale or advertising of services."). Thus, there can be no liability under the Lanham Act absent the use of a trademark in a way that identifies the source of the products and services being advertised by the defendant. *See, e.g., Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619, 623-26 (6th Cir. 1996) (for a mark to be "used" in commerce within the meaning of the Lanham Act, it must be advertised or promoted by the alleged infringer as a trademark).

Plaintiffs assert that WhenU is using their trademarks in two ways: (1) by using the plaintiffs' registered marks "to trigger the delivery of advertisements" and (2) by delivering advertisements to computer screens at the same time plaintiffs' websites are displayed. Motion p. 9 & n.3. Neither of these so-called "uses" is a "use in commerce" within the meaning of the Lanham Act, because neither is a use of the plaintiffs' trademarks to identify the source of the products and services advertised by WhenU.

The inclusion of web addresses in WhenU's proprietary directory – the first "use" alleged by plaintiffs – is done to identify the category the participating consumer is interested in, such as mortgages, and to dispatch a contextually relevant advertisement to that consumer. *See generally* Naider Aff. ¶¶ 28-36. The advertisement that is displayed does not bear the plaintiffs'

trademarks.  To the contrary, it bears WhenU's marks and branding as well as those of the advertiser.  Thus, the SaveNow software only uses a website address as a way of identifying the website itself.

Where, as here, a defendant is "only using [the plaintiffs'] trademark in a 'non-trademark' way – that is, in a way that does not identify the source of a product – then trademark infringement and false designation of origin laws do not apply." *Interactive Prods. Corp. v. A2Z Mobile Office Solutions, Inc.*, 326 F.3d 687, 695 (6th Cir. 2003) (citing *New Kids on the Block v. News America Publ'g, Inc.*, 971 F.2d 302, 307 (9th Cir. 1992)).[7]  This is so regardless of whether the web address is also a registered trademark.  *Bird v. Parsons*, 289 F.3d 865, 878 (6th Cir. 2002) (when a domain name is used to indicate an address on the Internet, and not to identify the source of goods and services, it is not functioning as a trademark.)

The fact that a computer user can view a screen display "consisting of both WhenU's advertisement along with the Plaintiffs' websites and trademarks" (Motion, p. 9) – the second "use" asserted by plaintiffs – is likewise not a use of plaintiffs' trademarks to advertise or promote another's products.  Plaintiffs are not entitled to exclusive access to an individual consumer's desktop any more than the erection of a billboard sign on a highway containing plaintiffs' trademarks would pre-empt a competitor from putting up a sign on the same stretch of

---

[7] *New Kids on the Block v. News America Publ'g, Inc.*, 971 F.2d 302, 306-08 (9th Cir. 1992), is illustrative.  In that case, a newspaper "used" the trademarked name of the musical group the "New Kids on the Block" to poll their readers about the group's members.  The polls used 900 area code numbers which generated revenue for the newspapers.  The court held that the Lanham Act had not been violated, noting that there was no practical way to describe the "New Kids on the Block" other than by using their name.  "In such cases, use of the trademark does not imply sponsorship or endorsement of the product, because the mark is used only to describe the thing, rather than to identify its source."  971 F.2d at 306.

road.  *See Playboy Enters., Inc. v. Netscape Communications Corp.*, 55 F. Supp. 2d 1070, 1075 (C.D. Cal. 1999), *aff'd,* 202 F.3d 278 (9th Cir. 1999) (analogizing search engine causing competitive advertisements to appear upon entry of plaintiffs' trademarks to erecting competing billboards on a freeway).  *See also New Kids on the Block*, 971 F.2d at 309 ("the trademark laws do not give the New Kids the right to channel their fans' enthusiasm (and dollars) only into items licensed or authorized by them.")

The juxtaposition of WhenU's advertisements with plaintiffs' websites in separate windows on a participating consumer's computer screen is, at most, a form of comparative advertising.  Comparative advertising rests on the premise that a competitor's trademark may appear at the same time as the trademark owner's.  3 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 25:52 (4th ed. 2003).  *See, e.g., G.D. Searle & Co. v. Hudson Pharm. Corp.,* 715 F.2d 837, 841-43 (3rd Cir. 1983) (inclusion of Metamucil trademark on a competitor's product not a prohibited use under the Lanham Act); *Diversified Mktg., Inc. v. Estee Lauder, Inc.,* 705 F. Supp. 128, 132-33 (S.D.N.Y. 1998) (finding phrase "If You Like ESTEE LAUDER...You'll love BEAUTY USA" lawful comparative advertising).

In accusing WhenU of "free riding" on their trademarks, plaintiffs ignore the fact that trademark laws are concerned only with source identification.  They are not meant to protect "consumer good will created through extensive, skillful, and costly advertising." *R.G. Smith v. Chanel, Inc.*, 402 F.2d 562, 566 (9th Cir. 1968).  The rule favoring comparative advertising "rests upon the traditionally accepted premise that the only legally relevant function of a trademark is to impart information as to the source or sponsorship of the product." *Id.*  Comparative advertisements may therefore make use of competitors' trademarks even if the advertiser reaps

the benefit of "the product recognition engendered by the owner's popularization, through expensive advertising, of the mark." *Anti-Monopoly, Inc. v. General Mills Fun Group*, 611 F.2d 296, 301 n.2 (9th Cir. 1979).[8]

**B.    Plaintiffs Have Not Demonstrated Likelihood of Confusion**

Plaintiffs urge the court to consider the eight factor test for determining customer confusion set forth in *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982). The *Frisch* test is designed to deal with a case in which the defendant is allegedly "using a mark to identify its goods that is similar to the plaintiff's trademark." *Interactive Prods. Corp. v. A2Z Mobile Office Solutions, Inc.*, 326 F.3d 687, 695 (6th Cir. 2003). Where, as here, the defendant is not using plaintiff's trademarks to identify its own services or products, the *Frisch* test does not apply. *Id.* at 695 (before proceeding to application of the *Frisch* factors, "there is a preliminary question about whether defendants are using the challenged mark in a way that identifies the source of their goods"). *See also Bird*, 289 F.3d at 877 (likelihood of confusion analysis not necessary in the absence of the use of a mark in a prohibited manner) (citing *Holiday Inns*, 86 F.3d at 626).

---

[8] The sole authority cited by plaintiffs for the proposition that WhenU's conduct constitutes trademark infringement is *Hard Rock Café Int'l v. Morton*, No. 97 Civ. 9483, 1999 WL 717995, at *25 (S.D.N.Y. Sept. 9, 1999). The defendant in *Hard Rock* had the contractual right to use the "Hard Rock Hotel" mark to market hotel services only. In an effort to circumvent that limitation, he designed the website he operated under the "Hard Rock Hotel" mark to "frame" a different website operated by an unrelated company which sold CDs. The court found that in light of this "seamless presentation" of one web page within another, the "only possible conclusion" was that the Hard Rock Hotel mark was being used to advertise and sell CDs in violation of the licensing agreement between the parties. This case does not involve framing, and *Hard Rock* does not address, and has no bearing on, the use of multiple windows on the same computer screen.

11

But even where consideration of the *Frisch* factors is appropriate, they are not to be applied mechanically. As the Sixth Circuit recently explained:

> "[e]ach case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case." The factors are only useful to the extent they assist in determining whether a likelihood of confusion exists. "The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way."

*Interactive Prods.*, 326 F.3d at 695 (quoting *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991)).

Plaintiffs have failed to establish the existence of confusion concerning the origin of the products and services advertised by WhenU. Plaintiffs have not come forward with any evidence showing that customers are confused or are likely to be confused as to the source of the goods and services advertised by WhenU's service. *See Interactive Prods.*, 326 F.3d at 694 (plaintiff has the burden of presenting evidence that defendant's product is likely to cause confusion). All plaintiffs offer are the conclusory assertions of their executives that it would be "natural" for a computer user to believe that an advertisement displayed at the same time a website is on the user's screen is authorized or endorsed by the website operator. Stapp Dec. ¶ 22; Tazelaar Dec. ¶ 22. Failure to present evidence of actual confusion should be fatal where, as here, the plaintiff is attacking an innovative form of advertising delivered through a "relatively recent technological phenomenon." *Paramount Pictures Corp. v. Video Broad. Sys., Inc.*, 724 F. Supp. 808, 816 (D. Kan. 1989).

The reality is that it would be very un-natural for a viewer of a SaveNow advertisement to conclude that it was sponsored by the plaintiffs. *See id.* at 817 (finding no risk of sponsorship confusion from defendant's placement of advertisements on the beginning of videocassettes

containing Paramount-branded content). Computer users often receive content from third parties while a particular website is displayed on their screen. Reinhold Dec. ¶ 40. SaveNow advertisements appear in separate window, are separately branded, and explicitly state: "This is a WhenU offer and is not sponsored or displayed by the websites you are visiting." Naider Aff. ¶ 48.[9] Furthermore, individuals who have downloaded the SaveNow program regularly receive distinctively branded offers through SaveNow. Naider Aff. ¶¶ 47-48. Because SaveNow users are accustomed to receiving these offers while accessing content from a variety of websites, they are in a position to understand that the advertisements do not come from the website they are viewing when the offer appears.[10]

## II.   WHENU HAS NOT INFRINGED PLAINTIFFS' COPYRIGHTS

### A.   WhenU Has Not Infringed Plaintiffs' Public Display Rights

To prevail on the claim that WhenU has violated their public display right, plaintiffs must prove that WhenU (1) "display[ed]" their websites and (2) did so "publicly." 17 U.S.C. § 106(5). To display a work means "to show a copy of it." 17 U.S.C. § 101. But WhenU does not transmit images of plaintiffs' websites. The only works displayed by the SaveNow software are WhenU coupons or WhenU advertisements. Naider Aff. ¶¶ 43-45.

---

[9] The Sixth Circuit has described such notices as "very informative" and declined to find likelihood of confusion in other cases based, in part, on such notices. *See Taubman Co. v. Webfeats*, 319 F.3d 770, 776 (6th Cir. 2003).

[10] Plaintiffs' invocation of the doctrine of "initial interest confusion" is unavailing. Motion, p. 13. Initial interest confusion occurs when a consumer is "lured to a product by its similarity to a known mark." *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 464 (7th Cir. 2000). In this case the only "use" of plaintiffs' marks is to indicate the customer's interest in a generic product type and to contrast the plaintiffs' products and services with the distinct and separately branded products and services offered by WhenU's advertisers. *See Playboy Enters.*, 55 F. Supp. 2d at 1074-75 (finding no initial interest confusion where entry of trademark into internet search engine yielded competitive advertising).

Recognizing that the only display of plaintiffs' websites occurs as a result of the conduct of individual computer users, and not WhenU, plaintiffs claim that WhenU is contributorily liable for the copyright infringement of individual computer users.   Complaint ¶¶ 133-135 (asserting that WhenU's software facilitates the unauthorized public display of their web sites by "third parties.")  According to plaintiffs, when these third party computer users receive a WhenU advertisement at the time one of the plaintiffs' websites is also displayed, they violate the plaintiffs' display right by "covering a portion of the [site's] content" with a SaveNow advertisement.  Motion p. 16.[11]

The only case cited to support the remarkable contention that this kind of activity – which millions of computer users engage in daily by simultaneously running multiple applications on their computer desktops – constitutes an unauthorized public display of a copyrighted website is *New York Times Co. v. Tasini*, 533 U.S. 483, 499 (2001).  However, *Tasini* did not involve the right of public display.   *Tasini* addressed the entirely separate question of whether the reproduction of New York Times print articles in electronic databases constituted a permitted "revision" of a collective work under 17 U.S.C. § 201(c), where the New York Times held a copyright in the collective work, but the individual authors held copyrights in the articles themselves.  *Id.* at 487-89.  The *Tasini* Court concluded that in determining whether the articles in the electronic database had been reproduced as part of a revision of the original collective work of the newspaper, the fact that the articles appeared in the electronic database "without the

---

[11] There can be no liability for contributory infringement of copyright absent direct infringement. *See, e.g., Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998). Thus, plaintiffs can establish contributory liability by WhenU only by establishing direct infringement on the part of SaveNow users.

graphics, formatting, or other articles with which the article was originally published" tended to show the articles were being reproduced as individual articles, and not as a permissible revision of the original collective work. *Id.* at 500. That conclusion has no bearing on the ability of a computer user to modify their own display any more than it bears on the right of newspaper readers to cut out individual articles and place them in personal scrapbooks.

Computer users who cause the display of SaveNow advertisements do not "alter[] the appearance of Plaintiffs' websites." Motion at 16. SaveNow resides on the hard drives of individual computers and never comes into contact with plaintiffs' websites. Reinhold Dec. ¶ 47; Naider Aff. ¶¶ 51-54. Accordingly, the SaveNow software is, at most, a permitted third party application which may temporarily alter the appearance and function of a user's copy of a copyrighted work, but which does not infringe it. *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 780 F. Supp. 1283 (N.D. Cal. 1991), *aff'd*, 964 F.2d 965 (9th Cir. 1992) (finding no copyright infringement from video game accessory that attached to the plaintiff's video game console and allowed an individual player to alter significantly aspects of the games played using plaintiff's copyrighted game cartridges).

Finally, the public display right only governs the right to display a work "at a place open to the public" or "to transmit or otherwise communicate a performance or display of the work to . . . the public." 17 U.S.C. § 101. A display is not public unless the nature of the place where the display occurs is a place open to the public. *Tangorre v. Mako's, Inc.*, No. 01 Civ. 4430, 2003 WL 470577 (S.D.N.Y. Jan. 6, 2003) (holding that customer's display of photographer's work to a printing company and a clothing supplier did not constitute a "public" display). *See also* 2 *Nimmer on Copyright* § 8.20[A] ("An unauthorized display will not constitute an infringement,

unless it is done 'publicly.'"); *Streeter v. Rolfe*, 491 F. Supp. 416, 421 (W.D. La. 1980) (private display of copyrighted work not a violation of the public display right). The only display of plaintiffs' works that is attacked in the complaint is the private display of content sent by plaintiffs' websites to the personal computers of individual consumers. This is not a public display as a matter of law.[12]

### B.  WhenU Has Not Infringed Plaintiffs' Right to Prepare Derivative Works

To prevail on their claim that WhenU has violated their exclusive right to create derivative works, plaintiffs would have to show that WhenU has incorporated the plaintiffs' websites into a new work. 1 *Nimmer on Copyright* § 3.06; 17 U.S.C. § 101 (a derivative work is "a work based on one or more preexisting works" that is "recast, transformed or adopted.") Plaintiffs cannot make this showing as to WhenU. WhenU merely provides a software product to computer users. WhenU does not recast, transform or adapt any of plaintiffs' copyrighted works.

Nor can plaintiffs show that WhenU users create derivative works. Plaintiffs assert that computer users who download the SaveNow software modify the plaintiffs' websites, noting that a derivative work can be created when deletions or alterations are made from the original work.[13]

---

[12] The way a website appears on a user's screen is affected by many things including the user's decision to alter the size or shape of the window in which the content appears. Reinhold Dec. ¶¶ 37-40. While these factors may significantly alter the appearance of plaintiffs' website content on a user's computer, they do not implicate the plaintiffs' *public* display rights.

[13] Plaintiffs rely on cases in which copyrighted material was not merely altered, but then publicly re-transmitted in the altered form. *See, e.g., WGN Cont'l Broad. Co. v. United Video, Inc.*, 693 F.2d 622, 626 (7th Cir. 1982) (intermediate carrier deleted text from television program and then re-broadcast the modified version via cable systes); *Nat'l Bank of Commerce v. Shaklee Corp.*, 503 F. Supp. 533, 544 (W.D. Tex. 1980) (direct sales organization sent modified copies of book

Motion, p. 16. But the SaveNow software does not have any effect on the plaintiffs' websites which reside on separate, secure servers. All that the SaveNow software does is cause a SaveNow window to open on a participating consumer's computer screen; it does not modify the content displayed in any previously opened window on the user's screen. Reinhold Dec. ¶ 46.

Even if the presence of an overlapping window could be said to change the appearance of the underlying window on a user's computer "desktop," it would not constitute a derivative work any more than placing one copyrighted work on top of another on a traditional desktop would create a derivative work. *Cf. Lewis Galoob Toys*, 780 F. Supp. at 1291 ("the consumer may experiment with the product and create new variations of play, for personal enjoyment, without creating a derivative work").

Finally, "[i]n order for a work to qualify as a derivative work it must be independently copyrightable," *Woods v. Bourne Co.*, 60 F.3d 978, 990 (2d Cir. 1995), and to be independently copyrightable, it must be "fixed" – that is, it must be "sufficiently permanent or stable to permit it to be ... reproduced." *See* 17 U.S.C. §§ 101, 102; *Medforms, Inc. v. Health Care Mgmt. Solutions, Inc.*, 290 F.3d 98, 107 (2d Cir. 2002). *See also Lewis Galoob Toys, Inc.*, 964 F.2d at 967-969 ( "[a] derivative work must incorporate a protected work in some concrete or permanent form."); *Micro Star v. Formgen, Inc.*, 154 F.3d 1107, 1111 n.4 (9th Cir. 1998) (noting, by way of example, that covering a television screen with pink cellophane, while modifying the appearance of the copyrighted programs, would not create a derivative work "because it does not incorporate the modified image in any permanent or concrete form."). This requirement is not met here,

---

to approximately 240,000 distributors). In marked contrast, plaintiffs here do not allege any general or public re-transmission of the alleged derivative work by computer users.

because the appearance of a WhenU advertisement on a consumer's computer screen at the same time as one of the plaintiffs' web pages is a transitory occurrence.  Reinhold Dec. ¶¶ 46-47.

**C.    Plaintiffs Have Not Limited Access to their Websites and Have Impliedly Consented to the Display of their Websites in the Windows Environment that Exists on Today's Computer Desktops**

Plaintiffs' attempt to show that they have not consented to the display of their websites on the screens of SaveNow users is unavailing.  *See* Motion, p. 15; Tazelaar Dec. ¶ 17; Stapp Dec. ¶ 17 (asserting that the display of content sent from plaintiffs' websites is "subject to restrictions" that are set forth in an alleged "license.").   The delivery of content from the plaintiffs' websites is triggered when a computer user enters one of the plaintiffs' URLs or clicks on a hyper-link to the website.  At no point in this process is a consumer asked to agree to any "terms or conditions" as a prerequisite to accessing the site.  Reinhold Dec. ¶ 67.  *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 31 (2d Cir. 2002) (licensor must either provide "immediately visible notice of the existence of the license terms" prior to delivery of the data or "require unambiguous manifestation of assent to those terms" for license to be enforceable).  *See also Pakideh v. Franklin Commercial Mortgage Group*, 540 N.W.2d 777, 780 (Mich. Ct. App. 1995) (finding no contract formed unless acceptance of purported terms is "unambiguous.").

Indeed, by sending copyrighted data or material to individual users without conditioning the receipt of that material on agreement to formal licensing terms, the plaintiffs can be deemed to have granted an implied license to use that material.  *Quinn v. City of Detroit*, 23 F. Supp. 2d 741, 749 (E.D. Mich. 1998) (holding that a programmer's conduct in installing copyrighted

material on individual computers granted the owners of those computers an implied license to use it).[14]

## III.  PLAINTIFFS, WHO HAVE LONG KNOWN OF WHENU'S ADVERTISING, HAVE NOT SUFFERED IRREPARABLE HARM

A finding of irreparable harm is "the single most important prerequisite that the Court must examine when ruling upon a motion for a preliminary injunction." *Metrobanc* v. *Federal Home Loan Bank Bd.,* 666 F. Supp. 981, 984 (E.D. Mich. 1987). Irreparable harm means more than merely "substantial" harm. *Ramik v. Darling Int'l, Inc.,* 161 F. Supp. 2d 772, 778 (E.D. Mich. 2001). Plaintiffs have not demonstrated substantial harm, much less irreparable injury. In the section of the Motion entitled "Harm to Public and Plaintiffs," the only tangible injury plaintiffs allege is its argument that WhenU is "free-riding" on the plaintiffs' reputation and goodwill. Motion, p. 10. To the extent plaintiffs could demonstrate that WhenU unlawfully took advantage of its marks to benefit itself without compensation, plaintiffs' injury would be purely monetary in nature, and compensable by paying damages for the alleged unjust enrichment.

Another factor that militates against a finding of irreparable harm is significant delay in bringing a motion for injunctive relief. *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir. 1985) ("Significant delay in applying for relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay

---

[14] Even if plaintiffs could demonstrate an infringement of one of their exclusive rights under 17 U.S.C. § 106, the user (and, by extension, WhenU) would be protected by the "fair use" doctrine. *See* 17 U.S.C. § 107. *See, e.g., Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417 (1984) (sale of video recorders is not contributory infringement because the taping of copyrighted television programs by individual television viewers was "fair use"); *Sony Computer Entm't America, Inc. v. Bleem,* 214 F.3d 1022 (9th Cir. 2000) (copying of "screen shots" from plaintiff's computer games and use in its own advertising was legitimate comparative advertising and fair use).

alone may justify denial of a preliminary injunction for trademark infringement"); *Ramik*, 161 F. Supp. 2d at 778. Quicken has been aware since at least August 2002, and Wells Fargo has been aware since at least October 2002, that consumers using the SaveNow software could receive advertising from WhenU while visiting the plaintiffs' websites. Motion, p. 5-6, Tazelaar Dec. ¶ 19; Stapp Dec. ¶ 19. Indeed, plaintiffs have provided the Court with screenshots taken in October and November 2002 of SaveNow windows appearing in conjunction with windows displaying pages from their websites.

Although plaintiffs have known of SaveNow for months, they made no attempt to take any action to ameliorate any alleged harm resulting from the SaveNow software. Instead, plaintiffs appear to have spent the seven months after October 2002 leisurely filing various copyright applications.[15] Then, almost eight months after the October screenshot was taken, plaintiffs filed this Motion seeking a preliminary injunction on the grounds that they would suffer "irreparable harm" as a result of the same WhenU business activities that plaintiffs tolerated without any apparent concern for the previous eight months. If plaintiffs could tolerate eight months of alleged trademark infringement simply to bolster additional causes of action, they can wait a few more months for an adjudication on the merits.

## IV.    ISSUANCE OF A PRELIMINARY INJUNCTION WOULD HARM OTHERS

Issuance of a preliminary injunction would significantly disrupt WhenU's business. Injunctive relief would disrupt WhenU's established relationships with advertisers and harm WhenU's ability to obtain new advertisers. Given the sweeping nature of plaintiffs' trademark

---

[15] According the Motion, Wells Fargo filed a copyright registration application for the Wells Fargo website on March 21, 2003 and Quicken Loans filed a copyright registration application for the Quicken Loans website on April 21, 2003. Motion, pp. 4 -5.

and copyright claims, it is not clear that WhenU could comply with plaintiffs' requested injunction without shutting down its business altogether. Naider Aff. ¶¶ 56-58

Issuance of a preliminary injunction would also cause harm to WhenU users and WhenU advertisers. WhenU advertisers would lose the ability to have their competitive offers delivered to potential customers by SaveNow. Similarly, SaveNow users would lose the ability to receive coupons and view offers of interest to them that they would have received. Naider Aff. ¶ 55.

The sole basis for plaintiffs' allegation that third parties would not be harmed by entry of injunctive relief is plaintiffs' assertion that WhenU is causing customers to be diverted from plaintiffs' websites. Motion, p. 19. Even if this contention were true -- and it is not -- all it would prove is potential harm to the plaintiffs, not to customers who seek more attractive offers elsewhere. Moreover, plaintiffs' supposition about possible annoyance of customers is belied by the fact that SaveNow users install the software on their computers and have the option of removing it at any time. Naider Aff. ¶¶ 38, 41.

## V.   ISSUANCE OF AN INJUNCTION WOULD HARM THE PUBLIC INTEREST

Plaintiffs' motion for an injunction is a direct threat to the rights of computer user's to customize their displays. If plaintiffs' arguments were to be credited, the mere act of accessing data from a commercial website would prevent a consumer from employing any software that might cause a window to open up at the same time a web page is displayed. Thus, granting the injunction could chill the use and development of such useful applications as appointments software, instant messaging, or news or weather alert software. Reinhold Dec. ¶ 73.

In addition, granting the injunction to protect the plaintiffs from the rigors of competition threatens the integrity of the competitive process. Deighton Dec. ¶ 39. Federal policy has long

favored comparative advertising and disfavored restrictions on such advertising. *See, e.g.,* 16 C.F.R. § 14.15(c) (2003) (Federal Trade Commission policy statement); *August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 618 (7th Cir. 1995). This policy is further bolstered by the Supreme Court's view that the communicative value of advertising is worthy of constitutional protection under the First Amendment. *See, e.g., Edenfield v. Fane*, 507 U.S. 761, 767 (1993) ("The commercial marketplace . . . provides a forum where ideas and information flourish."). Finally, granting the injunction could chill development of the Internet which needs adware to support the infrastructure of the Internet. Deighton Dec. ¶¶ 38-40; Reinhold Dec. ¶¶ 74-76.

In support of plaintiffs' contention that public policy favors the issuance of the injunction, plaintiff relies on bootstrap argumentation, asserting that preventing copyright violations serves the public interest. Motion, pp. 19-20. This is true in the sense that preventing any violation of the civil law serves the public interest. But plaintiffs notably fail to indicate any other tangible public benefit to issuing an injunction other than the impact on their own businesses.

## VI.    CONCLUSION

For the reasons set forth above, Plaintiffs' motion for a preliminary injunction should be denied.

Respectfully submitted,

**BUTZEL LONG**

By: _____
Leonard M. Niehoff (P36695)
**Attorneys for Defendant**
350 South Main Street, Suite 300
Ann Arbor, Michigan 48104
(734) 995-3110

**KRONISH LIEB WEINER & HELLMAN LLP**
**Attorneys for Defendant**
**Celia Goldwag Barenholtz**
**Michael D. Paley**
**Jason M. Koral**
1114 Avenue of the Americas
New York, New York  10036
(212) 479-6000

Dated:  June 23, 2003
90795

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

# SEE CASE FILE FOR ADDITIONAL DOCUMENTS OR PAGES THAT WERE NOT SCANNED