# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

WELLS FARGO & CO., et. at.,

                        Plaintiffs,

v.

WHENU.COM, INC.,

                        Defendant.

_____/

Case No. 03-71906
Hon. Nancy G. Edmunds

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Attorneys for Plaintiffs
By:    Jason Schian Conti (P55617)
32270 Telegraph Road, Suite 225
Bingham Farms, Michigan  48025-2457
(248) 566-8436

GIBSON, DUNN & CRUTCHER, LLP
Co-counsel for Plaintiffs
By:    Terence P. Ross
       Peter E. Jaffe
       Kendall I. Thiessen
       Amy E. Barrier
1050 Connecticut Ave., N.W.
Washington, D.C.  20036
(202) 955-8500

GIBSON, DUNN & CRUTCHER, LLP
Co-counsel for Plaintiffs
By:    Kendall I. Thiessen
1801 California St., Suite 4100
Denver, Colorado  80202
(303) 298-5718

_____/

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND PROPOSED CONCLUSIONS OF LAW

21

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND
## PROPOSED CONCLUSIONS OF LAW

Plaintiffs Wells Fargo & Company and WFC Holdings Corporation (collectively "Wells Fargo") and Quicken Loans Inc. ("Quicken Loans") (collectively, the "Plaintiffs"), respectfully submit the following Proposed Findings of Fact and Proposed Conclusions of Law in support of Plaintiffs' Motion For Preliminary Injunction.

## PROPOSED FINDINGS OF FACT

### The Parties

1.      Plaintiff Wells Fargo & Company is a publicly owned corporation organized and existing under the laws of the State of Delaware, with its principal place of business in San Francisco, CA. (Declaration of Wendy Tazelaar ("Tazelaar Dec.") at ¶ 3). Wells Fargo & Company is a registered bank holding company, the parent company of WFC Holdings Corporation, and the parent, directly or indirectly, of over 100 other subsidiaries that provide banking, insurance, wealth management and estate planning, investments, mortgage and consumer finance from thousands of stores, the Internet website located at http://www.wellsfargo.com (the "Wells Fargo Website"), and other distribution channels across North America and throughout the world. (Tazelaar Dec. at ¶ 3). Wells Fargo & Company is listed on the New York Stock Exchange. (Tazelaar Dec. at ¶ 3).

2.      Plaintiff WFC Holdings Corporation is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in San Francisco, CA. (Tazelaar Dec. at ¶ 5). WFC Holdings Corporation is a registered bank holding company, a wholly-owned subsidiary of Wells Fargo & Company and the direct or indirect parent company

2

of more than 100 subsidiaries that provide banking, insurance, wealth management and estate planning, investments, mortgage and consumer finance from thousands of stores, the Wells Fargo Website, and other distribution channels across North America and throughout the world. (Tazelaar Dec. at ¶ 5).

3.    Wells Fargo owns and operates the Wells Fargo Website. (Tazelaar Dec. at ¶ 9).

4.    Plaintiff Quicken Loans Inc. ("Quicken Loans") is a privately owned corporation organized and existing under the laws of the State of Michigan, with its principal place of business in Livonia, MI. (Declaration of Bryan Stapp (the "Stapp Dec.") at ¶ 3).

5.    Quicken Loans offers residential mortgages in all 50 states and provides a wide variety of mortgage products including but not limited to conventional, alternative, home equity, jumbo and government loans. (Stapp Dec. at ¶ 3).

6.    Quicken Loans owns and operates the Internet website located at http://www.quickenloans.com (the "Quicken Loans Website"). (Stapp Dec. at ¶ 7).

7.    Defendant WhenU.com, Inc. ("WhenU") is a privately owned corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York City, New York. (Answer at ¶ 11).

**Plaintiffs' Copyrights**

8.    Wells Fargo is the sole owner of the Wells Fargo Website and holds a valid copyright in the Wells Fargo Website. (Tazelaar Dec. at ¶ 9). Wells Fargo registered its copyright in the Wells Fargo Website with the Copyright Office of the United States Library of Congress (the "Copyright Office") on March 21, 2003. (*See* Copyright Application filed March 21, 2003) (appended to Complaint at Exhibit F).

9.      Quicken Loans is the sole owner of the Quicken Loans Website and holds a valid copyright in the Quicken Loans Website. (Stapp Dec. at ¶ 7). Quicken Loans registered its copyright in the Quicken Loans Website with the Copyright Office on April 21, 2003. (*See* Copyright Application filed March 21, 2003) (appended to Complaint at Exhibit G).

10.     Plaintiffs expend substantial time, effort and cost to create, design and maintain their websites. (Tazelaar Dec. at ¶¶ 8, 12); (Stapp Dec. at ¶ 12).

**Plaintiffs' Trademarks**

11.     On October 27, 1964, Wells Fargo registered the mark "WELLS FARGO" with the United States Patent and Trademark Office ("PTO") for use in Banking and Trust Services. The PTO trademark registration indicates that this trademark was first used in commerce on March 18, 1852. (*See* U.S. Reg. No. 779,187) (appended to Complaint at Exhibit A). U.S. Reg. No. 779,187 is currently owned by WFC Holdings Corporation. (Tazelaar Dec. at ¶ 10).

12.     On January 8, 2002, Wells Fargo registered the mark "WELLS FARGO" with the PTO, for use in connection with banking services, trust services, mortgage banking services, mortgage lending services, mortgage brokerage services, insurance services, investment of funds for others, mutual fund investment services, investment management services, investment advice and consultation services, and related financial services; online banking and financial services, namely, providing online access to accounts to banking customers via computer. (*See* U.S. Reg. No. 2,526,696) (appended to Complaint at Exhibit D). U.S. Reg. No. 2,526,696 is currently owned by Wells Fargo & Company. (Tazelaar Dec. at ¶ 10). These and other marks owned by Wells Fargo are referred to collectively as the "Wells Fargo Marks". (Tazelaar Dec. at ¶ 10).

13.     Wells Fargo prominently displays the Wells Fargo Marks on the Wells Fargo Website. (Tazelaar Dec. at ¶ 9).

14.     On January 25, 2000, Intuit Inc. registered the mark "QUICKEN LOANS" for use in connection with loan financing, consumer lending services, mortgage lending and providing information on loans and lenders, all via electronic means. (*See* U.S. Reg. No. 2,528,282) (Complaint, Exhibit E). Intuit Inc. then granted Quicken Loans an exclusive, nontransferable, non-assignable, perpetual license to this and other trademarks, collectively referred to as the "Quicken Loans Marks." (Stapp Dec. at ¶ 8).

15.     Quicken Loans is authorized to bring this lawsuit by virtue of its agreement with Intuit, Inc., which gave Quicken Loans the right to bring suit against unauthorized uses of the licensed Quicken Loans Marks. (Stapp Dec. at ¶ 11).

16.     Quicken Loans prominently displays the Quicken Loans Marks on the Quicken Loans Website. (Stapp Dec. at ¶ 7).

17.     The Plaintiffs have continuously used and promoted the above-described trademarks in interstate commerce in the United States and throughout the world since the issuance of each mark. (Tazelaar Dec. at ¶ 11; Stapp Dec. at ¶ 9).

18.     Wells Fargo has made extensive use of the WELLS FARGO name and mark for use, among other things, in connection with banking and trust services since 1852. (Tazelaar Dec. at ¶ 10). For over one hundred and fifty years, Wells Fargo has continuously used and promoted its various marks in interstate commerce in the United States and throughout the world. (Tazelaar Dec. at ¶ 11). The Wells Fargo Marks have been associated with the Wells Fargo business since its founding in 1852 and are distinctive designations of Wells Fargo, its services, and its website. (Tazelaar Dec. at ¶ 11).

19.     Wells Fargo is widely recognized as an industry leader in consumer and corporate financial services, with over 100 banking, insurance, wealth management and estate planning,

investments, mortgage and consumer finance subsidiaries. (Tazelaar Dec. at ¶¶ 6-7). Wells Fargo offers its services from more than 5,800 stores, the Wells Fargo Website, and through other distribution channels across North America and throughout the world. (Tazelaar Dec. at ¶ 6).

20.     Since at least 1999, Wells Fargo has displayed the Wells Fargo Marks to millions of Internet users throughout the world in connection with the Wells Fargo Website. (Tazelaar Dec. at ¶¶ 9, 13).

21.     Wells Fargo expends substantial resources to advertise its products and services on the World Wide Web and to drive web-traffic to the Wells Fargo Website. (Tazelaar Dec. at ¶¶ 29-30).

22.     Quicken Loans is widely recognized as an industry leader in corporate and consumer financial services, and is recognized as one of the country's leading lenders and the largest on-line lender, closing 7 billion dollars in home loans in 2002. (Stapp Dec. at ¶ 6).

23.     Quicken Loans has made extensive use of the Quicken Loans name and mark for use, among other things, in connection with loan financing, consumer lending services, mortgage lending and has continuously used and promoted its various marks in interstate commerce in the United States and abroad since 2000. (Stapp Dec. at ¶¶ 8-9). The Quicken Loans Marks have been associated with the Quicken Loans business since its inception and are distinctive designations of Quicken Loans, its services and its website. (Stapp Dec. at ¶ 9).

24.     Quicken Loans expends substantial resources to advertise its products and services on the World Wide Web and to drive web-traffic to its website. (Stapp Dec. at ¶¶ 29-30).

**Plaintiffs' Websites**

25.     Wells Fargo has spent significant time and effort to develop a website for prospective or existing customers of Wells Fargo to use to access Wells Fargo's products and services. (Tazelaar Dec. at ¶ 8). Services available via this website interface include personal and business banking, insurance, wealth management and estate planning, investments, mortgage and consumer finance. (Tazelaar Dec. at ¶ 8). Wells Fargo is the creator and sole owner of the Wells Fargo Website and holds a valid copyright to the Wells Fargo Website. (Tazelaar Dec. at ¶9).

26.     The Wells Fargo Website has been recognized with a wide range of awards. In 2002 alone, the Wells Fargo Website was repeatedly recognized for excellence. In May 2002, the Wells Fargo Website was rated #1 for small business among 90 large and mid-size banks. (Tazelaar Dec. at ¶ 7). In July 2002, Jupiter Research rated the Wells Fargo Website the #1 top Internet banking site for attracting, activating and retaining consumers. (Tazelaar Dec. at ¶ 7). In November 2002, Forbes selected the Wells Fargo Website as one of its "Best of the Web" banking picks. (Tazelaar Dec. at ¶ 7).

27.     Wells Fargo has deliberately designed its website to display its content in a manner that is visually attractive and easy for site users to navigate. (Tazelaar Dec. at ¶ 7). Wells Fargo takes great care and puts forth enormous effort to present its content with a specific "look and feel" that encourages its site visitors to remain at its site, to delve into the content on its site, and to return to its site in the future. (Tazelaar Dec. at ¶ 7).

28.     Wells Fargo derives a substantial portion of its revenue from e-commerce. (Tazelaar Dec. at ¶ 13). On average, there are over 4 million unique visitors to the Wells Fargo Website each month. (Tazelaar Dec. at ¶ 13). Many of Wells Fargo's customers regularly

acquire financial services from the Wells Fargo Website. (Tazelaar Dec. at ¶ 15). Currently, 33% of Wells Fargo's retail checking account customers (approximately 3.5 million customers) are online retail checking account customers. (Tazelaar Dec. at ¶ 14). Such customers and others will continue to visit the Wells Fargo Website and purchase Wells Fargo's products and services in the future. (Tazelaar Dec. at ¶ 15).

29.    The high level of traffic and commerce on the Wells Fargo Website is due in large part to the costly efforts that Wells Fargo has undertaken to build and promote its website and the goodwill associated with its marks. (Tazelaar Dec. at ¶ 13). In 2002 alone, Wells Fargo spent $376 million on marketing, advertising and promoting products and services under the Wells Fargo brand, and spent $400 million to develop, market and support the Wells Fargo Website. (Tazelaar Dec. at ¶ 12).

30.    The Wells Fargo Website contains the language "© 1999 - 2003 Wells Fargo. All rights reserved." This language by law gives notice to visitors of the Wells Fargo Website, that Wells Fargo is the exclusive owner of the copyright in this website, including the six (6) exclusive rights of "use" afforded to copyright owners. 17 U.S.C. § 106. In addition, the Wells Fargo Website contains terms and conditions of use that explicitly forbid any alteration of the Wells Fargo Website or the website's appearance. *See* the Wells Fargo Website homepage, "Privacy, Security and Legal" section, located at http://www.wellsfargo.com, (last visited July 11, 2003). (*See* Declaration of Amy E. Barrier ("Barrier Dec.") at Exhibit A). Terms and Conditions of use are also included on Wells Fargo's web page resource center for small business owners, (Barrier Dec. at Exhibit A), and are also built into some of the secured services that are offered throughout the website. (Tazelaar Dec. at ¶ 17). Those terms are displayed and posted when a user signs up for the secured service. (Tazelaar Dec. at ¶ 17).

31.     The Quicken Loans Website has been recognized with a wide range of awards. By way of a few, non-limiting examples, Quickenloans.com has been named a "Best of the Web" by Forbes, Money and PC magazines. (Stapp Dec. at ¶ 6). In addition, Fortune magazine named Quicken Loans one of the "100 Best Companies to Work For" in 2001 and 2002. (Stapp Dec. at ¶ 6).

32.     Since at least 2000, Quicken Loans has displayed the Quicken Loans Marks to millions of Internet users throughout the world in connection with the Quicken Loans Website. (Stapp Dec. at ¶ 12).

33.     Quicken Loans deliberately designed its website to display its content in a manner that is visually attractive and easy for site users to navigate. Quicken Loans takes great care and puts forth enormous effort to present its content with a specific "look and feel" that encourages its site visitors to remain at its site, to delve into the content on its site, and to return to its site in the future. (Stapp Dec. at ¶ 12).

34.     Quicken Loans derives a substantial amount of its sales from e-commerce, conducting approximately 60% of its business through the Quicken Loans Website. (Stapp Dec. at ¶ 12). In 2002, there were approximately 15 million visitors to the Quicken Loans Website. (Stapp Dec. at ¶ 12). The high level of traffic and commerce on the Quicken Loans Website is due in large part to the costly efforts that Quicken Loans has made to build and promote its website and the goodwill associated with its marks. (Stapp Dec. at ¶ 12). In 2002 alone, Quicken Loans spent $ 10 million on marketing, advertising and promoting products and services under the Quicken Loans Marks, including $8.3 million on marketing the Quicken Loans Website. (Stapp Dec. at ¶ 10).

35.     Quicken Loans' customers may commence and complete their transactions all on-line through the Quicken Loans Website. (Stapp Dec. at ¶ 13). Quicken Loans offers users the ability to personalize the services available on or through its website. For example, customers may retrieve account information, such as the status of a loan request, by registering on the Quicken Loans Website. (Stapp Dec. at ¶ 13).

36.     During the loan process, customers work directly with a team of experienced loans professionals located in Michigan. (Stapp Dec. at ¶ 14). Customers can interact with their Quicken Loans agent through on-line chat, e-mail and PC talk (voice-over IP). (Stapp Dec. at ¶ 14). Customers may also use Quicken Loans' entirely automated equity online product, "EquityOnline$^{SM}$". (Stapp Dec. at ¶ 14).

37.     Many of Quicken Loans' customers regularly acquire lending related services from the Quicken Loans Website and have developed a strong relationship with the Quicken Loans Website. (Stapp Dec. at ¶ 15). It is probable that such customers and others will continue to visit the Quicken Loans Website and purchase Quicken Loans' products and services in the future. (Stapp Dec. at ¶ 15).

38.     The Quicken Loans Website contains the language "© 2000 - 2003 Quicken Loans Inc., All rights reserved." This language by law gives notice to visitors of the Quicken Loans Website, that Quicken Loans is the exclusive owner of the copyright in this website, including the six (6) exclusive rights of "use" afforded to copyright owners. 17 U.S.C. § 106. In addition, the Quicken Loans Website contains terms and conditions of use that explicitly forbid any alteration of the Quicken Loans Website or the website's appearance. (Barrier Dec. at Exhibit B; Stapp Dec. at ¶ 17).

39.     Plaintiffs maintain strict control over the content of advertising on their websites. Neither Wells Fargo nor Quicken Loans advertise any products other than those offered by Plaintiffs, their affiliates, or authorized third parties on the Plaintiffs' websites. (Complaint at ¶¶ 47, 60).

### WhenU 's Business

40.     WhenU is in the business of selling online advertising to third parties. (Answer at ¶ 61). But rather than sell advertising on its own website, WhenU delivers advertisements to the PCs of WhenU users while they are viewing other websites, including each of the Plaintiffs' Websites. (Declaration of Avi Naider (the "Naider Dec.") at ¶¶ 30-31).

41.     WhenU's business is described on its website, located at http://www.whenu.com. WhenU's website informs prospective clients that WhenU can "[d]rive traffic by allowing online merchants to advertise at competitors' sites." *See*, WhenUShop News, located at http://www.whenushop.com/news/news6.html (last visited on July 11, 2003). (Barrier Dec. at Exhibit J).

42.     WhenU distributes a software program called SaveNow, as well as other software programs, that reside on a PC user's computer. SaveNow is typically bundled with many of the Web's most popularly downloaded software programs, including MP3 players, screensavers, and peer-to-peer file sharing programs such as "KaZaA." (Defendant's Proposed Findings of Fact and Conclusions of Law ("Def. Prop. Facts") at ¶ 11). A user downloading any of these third-party programs will typically receive WhenU software as well, and it is often impossible to obtain the desired third-party software without also obtaining WhenU software. (Declaration of Benjamin G. Edelman ("Edelman Dec.") at ¶ 40).

11

43.     Some of the third-party programs with which the WhenU software is bundled are available on the Internet in numerous versions, including old versions. (Edelman Dec. at ¶ 40). Old versions of these third-party programs often install WhenU without a user's knowledge or consent, without displaying the WhenU license agreement, and/or without displaying the WhenU license agreement in a time, format and style in which it can be meaningfully reviewed and evaluated. (Edelman Dec. at ¶ 40).

44.     Although WhenU's SaveNow software has been downloaded 100 million times, it currently resides on approximately 25 million PCs. (Answer at ¶ 68). Thus, at least 3 out of every 4 PC users whose PCs have become infected with SaveNow, do not want it.

45.     Once the SaveNow software program is installed on a user's PC, SaveNow begins to download the WhenU directory of targeted key words, URLs and other terms, onto the user's computer. (Def. Prop. Facts at ¶ 29; Naider Dec. at ¶ 28). Once the Directory has been downloaded, the SaveNow program continues to communicate with the WhenU server when the user initiates an Internet browser based activity, and sends Directory "updates" to the user's computer daily. (Def. Prop. Facts at ¶ 29).

46.     WhenU's SaveNow software operates by constantly monitoring the user's Internet browsing activities. (Def. Prop. Facts at ¶ 31). The delivery of a WhenU pop-up advertisement to the user's PC may be triggered when the user requests a particular web page, whose URL was selected by WhenU for inclusion in its Directory. (Edelman Dec. at ¶¶ 22-23). When the user attempts to view the requested web page, WhenU's SaveNow software causes an on-screen display of one of possibly several linked pop-up advertisements on the user's PC. (Def. Prop. Facts at ¶ 31; Answer at ¶ 62(c)(d)).

### *How WhenU Delivers Pop-Up Advertisements Onto the Plaintiffs' Websites*

47.     WhenU pop-up advertisements modify the visual display of the underlying

websites upon which the WhenU pop-up advertisements are triggered to be displayed. (Edelman

Dec. at ¶ 54). The modification is clear from a comparison of screen shots of the Plaintiffs'

Websites as typically viewed on an ordinary PC versus those same sites as viewed on a PC with

WhenU software installed. (Barrier Dec. at Exhibit I). In particular, when a PC user with

SaveNow software downloaded onto their computer views certain websites, the on-screen

display in many instances includes an advertisement provided by WhenU. (Edelman Dec. at ¶

54). The resulting display therefore varies from what was intended by the site's owners.

(Edelman Dec. at ¶ 54). Because this variation results precisely from the actions of WhenU's

software, WhenU modifies the on-screen display. (Edelman Dec. at ¶ 54).

48.     WhenU also causes modification of a portion of a PC's memory, namely the PC's

video memory (also known as video RAM). (Edelman Dec. at ¶ 55). Within a PC's video

memory, a frame buffer stores an exact representation of every window currently being shown

on screen. (Edelman Dec. at ¶ 55). The frame buffer maps precisely to the PC's on-screen

display and is organized according to the rows and columns of dots (also known as picture

elements or "pixels") that make up a PC's screen. (Edelman Dec. at ¶ 55). Accordingly, when a

WhenU advertisement covers a portion of a web page as viewed in a user's web browser, the

covered portion of the web page is actually replaced in video memory with the WhenU

advertisement. (Edelman Dec. at ¶ 55).

49.     WhenU's pop-up advertisements do not actually overlay the Plaintiffs' web

pages. Because a PC screen is two dimensional, it has only a single on-screen display -- not

multiple screens in some way stacked above and below each other. (In this respect, three

dimensional analogies to billboards and the like are wholly inapposite.) (Edelman Dec. at ¶ 56).

Examining the actual functionality of WhenU's software, directory, and control code, it is clear

that WhenU transmits specific instructions to a PC as to advertisements to be displayed.

(Edelman Dec. at ¶ 56). WhenU conveys those instructions to the PC's operating system,

commanding that the PC show pop-up advertisements that override Plaintiffs' copyrighted web

page code and that modify the video memory of the PC in order to change the resulting display

of Plaintiffs' web pages. (Edelman Dec. at ¶ 56). Thus, when WhenU advertisements are

displayed, WhenU's software actually replaces a portion of Plaintiffs' web pages with WhenU's

advertisements. (Edelman Dec. at ¶ 56).

### *When Uses Plaintiffs' Trademarks*

50.    The WhenU Directory is comprised of 40,000 elements such as web addresses

("URLs"), including the URLs of Plaintiffs; search terms; and key word algorithms. (Naider

Dec. at ¶¶ 29, 32). Each of the WhenU Directory elements, including Plaintiffs' trademarks and

URLs, was carefully selected by WhenU for inclusion in the Directory. (Naider Dec. at ¶ 29).

51.    The WhenU Directory is not comparable to the Yellow Pages. WhenU does not

seek consent from the website owners before including their URLs and associated trademarks in

the WhenU Directory. WhenU did not seek Plaintiffs' consent before including Plaintiffs' URLs

and associated trademarks in the WhenU Directory. (Answer at ¶¶ 65, 67). The Yellow Pages

provides authorized advertising for the purpose of attracting consumers to the listed companies.

In sharp contrast, WhenU's unauthorized pop-up advertisements hijack customers from, rather

than attract business to, the targeted websites. The Yellow Pages organizes authorized company

listings in order to assist consumers in locating a particular type of business. WhenU's Directory

14

categorizes websites (and the associated URLs) for the purpose of selling pop-up advertising onto these websites. (Def. Prop. Facts at ¶ 36).

52.     WhenU uses Plaintiffs' registered marks to advertise its services. WhenU groups multiple URLs together in order to "sell[] advertising to advertisers on a category basis." (Naider Dec. at ¶ 35). Such grouping into categories is not required for the operation of WhenU's software program. (Edelman Dec. at ¶¶ 26-27, 30). Thus, WhenU relies on the fame and consumer recognition of Plaintiffs' famous registered marks to advertise its services and to sell advertising on the Plaintiffs' websites.

53.     WhenU uses Plaintiffs' registered marks to implement the advertising services that it sells. WhenU selected Plaintiffs' URLs for inclusion in the WhenU Directory. (Def. Prop. Facts at ¶¶ 31-32). When a PC user visits Plaintiffs' Websites, WhenU's SaveNow software detects that the user has chosen to access the Plaintiffs' Websites and delivers an ad for (an often competing) loan or mortgage product or service to appear on the PC user's computer screen. (Def. Prop. Facts at ¶ 31; Answer at ¶ 62(d)). Thus, the WhenU pop-up advertisements are linked to the Plaintiffs' trademarks, and are triggered to appear when the WhenU software program detects that the user is viewing, or is attempting to view, the Plaintiffs' Websites. (Edelman Dec. at ¶¶ 23).

54.     When an advertisement is delivered to Plaintiffs' Websites, the user sees a screen display consisting of both WhenU's ad along with the Plaintiffs' Websites and trademarks. In this display, the Plaintiffs' marks are associated with WhenU's advertisement and that advertisement is relying on, and thus using, Plaintiffs' marks to advertise the products and services of WhenU's clients. (*See, e.g.,* Barrier Dec. at Exhibit I).

55.    WhenU's pop-up advertisements are likely to prevent or hinder Internet users from accessing the Plaintiffs' services on the Plaintiffs' own Websites.  WhenU's pop-up advertisements may be triggered to appear at various points as the PC user navigates through the multiple web pages of the Plaintiffs' Websites.  Each time the PC user receives a WhenU pop-up advertisement, the PC user must affirmatively click to close the advertisement in order to view the Plaintiffs' Website. (Edelman Dec. at ¶ 58).  If the PC user mistakenly clicks on the advertisement when attempting to close it, the PC user will be hijacked to WhenU's advertiser's website.  Such PC users, who are presumably searching for services provided by the Plaintiffs on their websites, may fail to continue to search for such services due to confusion or frustration. (Tazelaar Dec. at ¶ 26; Stapp Dec. at ¶ 26).  WhenU's conduct in appropriating Plaintiffs' Marks thus has a connection to Plaintiffs' distribution of their services.  Such conduct constitutes a use of Plaintiffs' Marks in commerce.

### *WhenU's Pop-up Advertisements Confuse Consumers As To The Source, Origin Or Sponsorship Of The Pop-up Advertisements And Create A False Impression That The Pop-up Advertisements Are In Some Way Affiliated With, Connected To, Or Otherwise Approved By The Underlying Website*

56.    WhenU's pop-up advertisements frequently appear at approximately the same time that a PC user accesses the Plaintiffs' websites.  (Answer at ¶ 62(c)).  These advertisements typically cover portions of the content that the Plaintiffs intended to be displayed.  (Tazelaar Dec. at ¶ 19; Stapp Dec. at ¶ 19; Edelman Dec. at ¶¶ 53-54).

57.    When a PC user with WhenU software seeks to view a specific website and subsequently receives a pop-up advertisement, the PC user may fail to understand that the display of that advertisement is caused by the presence of WhenU software rather than by the requested website.  (Edelman Dec. at ¶ 43).

58.     Despite that fact that WhenU states that consumers must affirmatively accept a license agreement before SaveNow software is downloaded onto the user's PC, many PC users are unaware that WhenU software has been downloaded.  (Declaration of William D. Neal, ("Neal Dec.") at ¶ 6(b)).  A recent research survey conducted by William D. Neal based on WhenU pop-up advertisements (the "Neal Survey") found that 51% of those surveyed who had WhenU's SaveNow program installed on their PCs had never heard of that software program and 68% of those surveyed who had WhenU's SaveNow program installed on their PCs did not know it was installed on their computer prior to participating in the research study.  (Neal Dec. at ¶ 6(b)).  Of the research participants who knew that SaveNow was installed on their computer, 57% said it was loaded on their computer without their knowledge.  (Neal Dec. at ¶ 6(c)).

59.     Even if a PC user is aware, or becomes aware, that WhenU's software has been downloaded onto their PC, the PC user may not know that WhenU's SaveNow software generates pop-up advertisements.  (Neal Dec. at ¶ 6(c)).  Of the respondents in the Neal Survey who had WhenU's SaveNow program installed on their PCs, 76% did not know that SaveNow software generates pop-up advertisements in response to viewing certain websites.  (Neal Dec. at ¶ 6(c)).

60.     Further, because website owners are expected to control the content of their websites, it is natural for a viewer of the Plaintiffs' Websites to believe that pop-up advertisements delivered there are authorized by, or endorsed by, the Plaintiffs.  (Tazelaar Dec. at ¶ 22;  Stapp Dec. at ¶ 22;  Edelman Dec. at ¶ 43).  This is a common device on websites to deliver special messages, such as special offers and discounts.  (Tazelaar Dec. at ¶ 22;  Stapp Dec. at ¶ 22).  Indeed, the Neal Survey found that 60% of all survey respondents believe that "pop-up advertisements are placed on the website on which they appear by the owners of that

17

website." (Neal Dec. at ¶ 6(c)). Further, the Neal Survey found that 52% believe that "pop-up advertisements have been pre-screened and approved by the website on which they appear." (Neal Dec. at ¶ 6(c)).

61.     Disclaimers recently added to the WhenU pop-up advertisements are insufficient to dispel consumer confusion. Academic research has concluded that disclaimers do not alleviate consumer confusion. *See* Jacoby & Szybillo, *Why Disclaimers Fail,* 84 Trademark Rept. 224 (1994); Jacoby & Raskopf, *Disclaimers as a Remedy for Trademark Infringement Litigation: More Trouble Than They Are Worth?,* 76 Trademark Rept. 35 (1986).

### Plaintiffs' Discovery Of WhenU's Pop-Up Advertising Scheme

62.     Wells Fargo first became aware that WhenU was placing pop-up and other advertisements over the Wells Fargo Website in the fall of 2002. (Tazelaar Dec. at ¶19).

63.     Quicken Loans first became aware that WhenU was placing pop-up and other advertisements over the Quicken Loans Website in August 2002. (Stapp Dec. at ¶ 19).

64.     Once Plaintiffs became aware that WhenU was placing pop-up advertisements onto the Plaintiffs' Websites, Plaintiffs diligently researched the process by which WhenU's SaveNow software operates to deliver pop-up advertisements. (Declaration of Lane Mortensen ("Mortensen Dec.") at ¶ 5; Declaration of Richard Chyette ("Chyette Dec.") at ¶ 5).

65.     During the fall and winter of 2002, Plaintiffs gradually became aware of the financial impact and level of harm to Plaintiffs' reputations and customer goodwill caused by the WhenU pop-up advertisements. (Mortensen Dec. at ¶ 8; Chyette Dec. at ¶ 6). Plaintiffs diligently sought to discover why WhenU's pop-up advertisements were displayed on some users' PCs, and not on others. (Mortensen Dec. at ¶ 6; Chyette Dec. at ¶ 7). Plaintiffs learned

that WhenU distributes a software program called "SaveNow" that is downloaded onto a user's PC, and that WhenU's software program causes the delivery of pop-up advertisements when a PC user visits certain websites, including the Plaintiffs' Websites. (Mortensen Dec. at ¶ 7; Chyette Dec. at ¶ 6). Over several months, Plaintiffs dedicated resources to better understand WhenU's complex, proprietary technology. (Mortensen Dec. at ¶ 7; Chyette Dec. at ¶ 8).

66.     Around February 2003, once Plaintiffs had a better understanding of the impact of WhenU's pop-up advertising scheme, Plaintiffs authorized outside counsel to research and to help Plaintiffs understand the complex legal issues implicated by WhenU's pop-up advertising scheme. (Mortensen Dec. at ¶ 9; Chyette Dec. at ¶ 9). Plaintiffs concluded that WhenU's pop-up advertising scheme was unlawful. (Mortensen Dec. at ¶ 9; Chyette Dec. at ¶ 9).

67.     A mere three months later, on May 16, 2003, Plaintiffs filed the Complaint in this lawsuit.

68.     On May 20, 2002, Plaintiffs filed a Motion for Preliminary Injunction in this lawsuit.

69.     In short, Plaintiffs moved as expeditiously as possible (consistent with conducting an appropriate pre-filing investigation) to seek relief from WhenU's conduct after learning that their websites were under systematic attack by WhenU's pop-up advertising scheme.

**An Injunction Will Not Substantially Harm WhenU**

70.     The entry of a preliminary injunction against WhenU will not cause substantial harm to WhenU. Plaintiffs' URLs constitute only two (2) URLs out of the 40,000 URLs and other elements included within the WhenU Directory. (Naider Dec. at ¶¶ 29, 32). Issuance of an injunction prohibiting WhenU from placing pop-up advertisements on the Plaintiffs' Websites will not impact WhenU's ability to place advertisements on other websites.

71.    WhenU's SaveNow software includes a "suppress" list of domain names on which advertisements are not to be shown. (Edelman Dec. at ¶¶ 33-38). As of May 1, 2003, this suppress list included 39 distinct domain names. (Edelman Dec. at ¶ 38). Among these domain names are companies that have sued WhenU as well as companies that have sued The Gator Corporation, a competitor of WhenU that uses similar methods of advertisement display. (Edelman Dec. at Appendix 1).

72.    WhenU can easily modify this "suppress" list to include Plaintiffs' domain names. The WhenU control code indicates that expanding the WhenU suppress list requires only a simple modification of text to include the additional domain names for which WhenU advertisements are no longer to be displayed. (Edelman Dec. at ¶¶ 37-38). Indeed, in the past two months, WhenU has dramatically expanded the "suppress list" -- from 39 domain names as of May 1, 2003 to 265 domain names as of July 1, 2003. (Edelman Dec. at ¶ 38).

**An Injunction Is In The Public Interest**

73.    The public interest is served by preventing confusion and deception. WhenU's pop-up advertisements confuse consumers as to the source or origin of the goods or services offered through the WhenU pop-up advertisements. (Neal Dec. at ¶ 6).

74.    When WhenU displays an advertisement, it sends information to its servers information about the specific URL a PC user was viewing prior to display of the advertisement. (Edelman Dec. at ¶ 50). This message to the WhenU servers also sends information about the PC user's location as well as the PC user's IP address. (Edelman Dec. at ¶ 50).

75.    WhenU software transmits this information to its servers with respect to all websites that trigger its advertisements. (Edelman Dec. at ¶ 51). It does so without regard for the privacy policies of the underlying sites. (Edelman Dec. at ¶ 51). To the extent that a user has

established expectations of privacy based on their relationship with the Plaintiffs' websites, WhenU's actions defeat those expectations.

76.    WhenU tells its advertising customers that it ". . . makes no guarantee to advertisers that their advertisements will appear when participating consumers access a particular website." (Naider Dec. at ¶ 35). Because WhenU has set no expectations with its advertisers concerning any particular domain names, they cannot now argue that removal of two web domains out of the hundreds of thousands of available domains would significantly impair those relationships.

77.    Further, a portion of the PCs on which WhenU software is installed experience severe negative effects as to performance and reliability. (Edelman Dec. at ¶¶ 44-47). Even when WhenU's software is working as its designers intended, it has negative effects on the PCs on which it is installed. (Edelman Dec. at ¶¶ 44-47). The substantial data transfers of WhenU's software program to the PC user's computer compete with a PC user's requested web pages for use of the PC user's Internet connection, slowing the user's Internet access. (Edelman Dec. at ¶¶ 44-47). WhenU's data transfer requirements particularly slow a PC user's access to the Internet for PCs with dial up connections to the Internet or with other slow connections. (Edelman Dec. at ¶¶ 44-47). In addition, uninstalling WhenU may prove difficult, or in some instances, impossible. (Edelman Dec. at ¶ 47).

## PROPOSED CONCLUSIONS OF LAW

### Jurisdiction

1.    Plaintiffs have brought claims against WhenU pursuant to the Lanham Act, 15 U.S.C. § 1114(1), § 1125(a) and § 1125(c); the Copyright Act, 17 U.S.C. §§ 101, *et. seq.*, the

Michigan Consumer Protection Act, and other common law causes of action, including unfair competition, tortious interference with prospective economic advantage and trespass to chattels.

2.      This Court has subject matter jurisdiction over this action under 15 U.S.C. § 1121, 28 U.S.C. § 1131, and 28 U.S.C. § 1338 (a) and (b).  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims brought herein as to form part of the same case or controversy.

### Preliminary Injunction Standard

3.      When considering whether to issue a preliminary injunction, the court must consider the following four factors:  (1) the likelihood that the plaintiff will succeed on the merits; (2) the likelihood of irreparable harm to the plaintiff if a preliminary injunction is denied; (3) the likelihood that issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of an injunction.  *See Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.,* 134 F.3d 749, 753 (6th Cir. 1998).

4.      These four (4) considerations are "factors to be balanced and not prerequisites that must be satisfied." *In re Eagle-Picher Indus., Inc.,* 963 F.2d 855, 859 (6th Cir. 1992).

### Likelihood of Success on the Merits

### Trademark Infringement

5.      The Lanham Act prohibits the infringement of a registered trademark, including "use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection . . . with which such use is likely to cause confusion, or to cause mistake, or to deceive. . . ." 15 U.S.C. § 1114(1)(a).

6.      To establish a claim for trademark infringement, Plaintiffs must prove:  (1) ownership of a valid mark that is entitled to protection under the Lanham Act, and (2) that

WhenU's use of the mark is likely to cause confusion within the consuming public. *See Champions Golf Club, Inc., v. The Champions Golf Club, Inc.,* 78 F.3d 1111, 1114 (6th Cir. 1996).

### *Ownership of a valid mark entitled to protection*

7.     Plaintiffs own valid trademarks that are entitled to protection under the Lanham Act. A certificate of registration of a trademark is *prima facie* evidence of the validity of the registered mark, of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce. 15 U.S.C. § 1057(b). Plaintiffs' marks have been registered with the PTO. A registered mark is presumed distinctive and "the defendant bears the burden of overcoming this presumption." *Nartron Corp. v. STMicroelectronics, Inc.,* 305 F.3d 397, 405 (6th Cir. 2002).

### *WhenU uses Plaintiffs' marks in commerce*

8.     WhenU uses Plaintiffs' marks in commerce. A mark is used in commerce "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce[.]" 15 U.S.C. § 1127.

9.     WhenU relies on the fame and consumer recognition of the Plaintiffs' marks to both sell advertising and to hijack viewers to the websites of its customers. When an advertisement is delivered to Plaintiffs' websites, the PC user sees a screen display consisting of both WhenU's ad along with the Plaintiffs' websites and trademarks. In this display, the Plaintiffs' marks are associated with WhenU's advertisement and the advertisement is relying on and, thus, using Plaintiffs' marks to advertise the products and services of WhenU's advertisers. *See Hard Rock Café Int'l (USA) Inc., v. Morton,* 1999 WL 717995, at *25 (S.D.N.Y. 1999). *See*

23

*also Home Box Office v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1315 (2d Cir. 1987).

10.     WhenU uses Plaintiffs' registered marks to advertise its services and to implement the advertising services that it sells by using Plaintiffs' Marks to trigger the display of advertising. *See Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 465 (7th Cir. 2000) (defendant infringed plaintiff's mark by using it to trigger defendant's website when Internet users searched for plaintiff's product) *See also New York State Socy. of Certified Publ. Accountants v. Eric Louis Assocs., Inc.*, 79 F. Supp. 2d 331, 342 (S.D.N.Y. 1999) (same).

11.     WhenU's pop-up advertisements are likely to prevent or hinder Internet users from accessing the Plaintiffs' services on the Plaintiffs' own websites. Prospective users of Plaintiffs' services who mistakenly access the websites of WhenU's advertisers may fail to continue to search for such services from Plaintiffs due to anger, confusion or frustration. WhenU's conduct in appropriating Plaintiffs' Marks has a connection to Plaintiffs distribution of their services. Such conduct is a use of the Plaintiffs' marks. *See People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 365 (4th Cir. 2001) (hypertext links which directly link the user to other websites providing services over the Internet in direct competition with plaintiffs interfere with plaintiffs distribution of plaintiffs' services and are a use of plaintiffs' marks); *Planned Parenthood Federation of America, Inc. v. Bucci*, 1997 WL 133313 at *4 (S.D.N.Y. 1997) ("defendant's use of the plaintiff's mark is 'in connection with the distribution of goods and services' because it is likely to prevent some Internet users from reaching plaintiff's own Internet web site.").

### *Consumer Confusion*

12.     A trademark holder establishes a *prima facie* case of trademark infringement by demonstrating that the allegedly infringing use of its trademark is likely to confuse consumers. *See Champion Golf Club, Inc.,* 78 F. 3d at 1116. "A successful Lanham Act plaintiff only must show a sufficient potential of confusion, not actual confusion." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr. Inc.,* 109 F. 3d 275, 284 (6th Cir. 1997) (emphasis omitted).

13.     Consumer confusion includes confusion of any kind, including confusion as to source, sponsorship, affiliation, connection or identification. *See Wynn Oil Co. v. American Way Serv. Corp.,* 943 F.2d 595, 599 (6th Cir. 1991). The issue is "whether [the] relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.,* 931 F.2d 1100, 1107 (6th Cir. 1991).

14.     To determine whether "likelihood of confusion" exists, courts in this Circuit use the eight-factor test set forth in *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.,* 670 F.2d 642, 648 (6th Cir. 1982): (1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the marks used by defendant (3) the relatedness of the parties' services; (4) the likelihood that one party will expand into the other's product line; (5) evidence of actual confusion between the marks; (6) the intent of the defendant in using the mark; (7) the marketing channels used; and (8) the sophistication of the consumer or likely degree of purchaser care. *Id.* While these factors must be considered when assessing likelihood of confusion, "these factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely." *Kellogg Co. v. Exxon Corp.,* 209 F.3d 562, 568 (6th Cir. 2000).

15.     Plaintiffs' Marks are distinctive and therefore accorded strong protection.

16. WhenU uses Plaintiffs' actual, exact trademarks.

17. WhenU's advertisers offer the exact same services as the Plaintiffs.

18. There is no need to expand into the services offered by Plaintiffs because the websites and services of the Plaintiffs are often identical to the websites and services promoted by WhenU's unauthorized advertisements.

19. WhenU's pop-up advertisements are likely to confuse consumers and have actually confused consumers as to the source, sponsorship, affiliation, connection or identification of WhenU's pop-up advertisements:

- WhenU's pop-up advertisements appear at approximately the same time as a user accesses the Plaintiffs' Websites. Many PC users fail to understand that the display of the WhenU advertisement is caused by the presence of WhenU software rather than by the Plaintiffs' Websites. Many PC users are unaware that SaveNow software has even been downloaded onto their PCs;

- Website owners are expected to control the content of their websites. Therefore, viewers of the Plaintiffs' Websites are likely to believe that pop-up advertisements delivered to the Plaintiffs' Websites are authorized by, or endorsed by, the Plaintiffs. Indeed, many PC users believe that WhenU's pop-up advertisements have been pre-screened and approved by the website on which they appear; and

20. WhenU intentionally and deliberately targets Plaintiffs' Websites to hijack Plaintiffs' customers.

21. The marketing channels used to deliver Plaintiffs' services and WhenU's services are identical -- both are provided over the Internet.

22.     Internet users are unlikely to be sophisticated. *See Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1057 (9th Cir. 1999).

23.     Thus, analysis of the eight *Frisch* factors overwhelming favors a finding of likelihood of confusion.

24.     The recent addition of disclaimers to the WhenU pop-up advertisements is insufficient to dispel consumer confusion. Academic research has concluded that disclaimers do not alleviate consumer confusion. *See* Jacoby & Szybillo, *Why Disclaimers Fail*, 84 Trademark Rept. 224 (1994); Jacoby & Raskopf, *Disclaimers as a Remedy for Trademark Infringement Litigation: More Trouble Than They Are Worth?*, 76 Trademark Rept. 35 (1986). In addition, courts have rejected disclaimers as a method for eliminating consumer confusion. *See, e.g. Charles of the Ritz Group, Ltd. v. Quality King Distribs., Inc.*, 832 F.2d 1317, 1324 (2d Cir. 1987). *See also, Home Box Office, Inc.*, 832 F.2d at 1315 ("[W]e note that there is a body of academic literature that questions the effectiveness of disclaimers in preventing consumer confusion as to the source of a product.").

## Copyright Infringement

25.     In order to establish a *prima facie* case of copyright infringement, plaintiffs must show: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc., v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991). *Accord Ronald Mayotte & Assocs. v. MGC Bldg. Co.*, 885 F. Supp. 148, 152 (E.D. Mich. 1994).[1]

---

[1] The word "copying" is shorthand for infringing "any of the copyright owner's five exclusive rights, described in 17 U.S.C. § 106." *S.O.S., Inc., v. Payday, Inc.*, 886 F.2d 1081, 1085 n.3 (9th Cir. 1989).

26. Anyone who, "'induces, causes or materially contributes to the infringing activity of another' with knowledge of the activity," may be held liable as a contributory infringer. *See GMC v. Ignacio Lopez de Arriortua,* 948 F. Supp. 684, 690-92 (E.D. Mich. 1996) (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159, 1162 (2nd Cir. 1971)).

### *Ownership of a valid copyright*

27. The creator of a work owns the copyright in the work. 17 U.S.C. § 201(a).

28. Plaintiffs are the creators and owners of their websites and the content that appears on their websites. (*See* Copyright Application for the Wells Fargo Website, appended to Complaint at Exhibit F; *See* Copyright Application for the Quicken Loans Website, appended to Complaint at Exhibit G; Tazelaar Dec. at ¶ 9; Stapp Dec. at ¶ 7). Accordingly, they own valid copyrights.

### *WhenU Infringes Plaintiffs' Exclusive Right to Prepare Derivative Works*

29. The right to prepare a derivative work is one of the six (6) exclusive rights afforded to the owner of a copyright. 17 U.S.C. § 106. A "derivative work" is a work "based upon one or more preexisting works" which consists of "editorial revisions, annotations, elaborations, or other modifications." 17 U.S.C. § 101.

30. Creation of a derivative work can occur whenever additions to, deletions from or edits of a copyrighted work occur. *See, e.g., WGN Cont'l Broad. Co. v. United Video, Inc.,* 693 F.2d 622, 626 (7th Cir. 1982); *Gilliam v. American Broadcasting Co.,* 538 F.2d 14, 12 (2d Cir. 1976) ("[U]nauthorized editing of the underlying work . . . would constitute an infringement of the copyright in that work similar to any other use of a work that exceeded the license granted by the proprietor of the copyright."). A derivative work may not be created without the permission of the copyright owner. 17 U.S.C. § 106.

31.     The addition of advertising material or promotional messages to the text of a copyrighted work is an infringement of copyright if the addition was done without authority. *See, e.g., Nat'l Bank of Commerce v. Shaklee Corp.,* 503 F.Supp. 533, 544 (W.D. Tex. 1980).

32.     The addition of WhenU's pop-up advertisements to the Plaintiffs' Websites creates a derivative work in the Plaintiffs' Websites. From the perception of the viewer, WhenU's advertising scheme alters the appearance of Plaintiffs' websites. *See New York Times Co. v. Tasini,* 533 U.S. 483, 499 (2001) (in determining whether copyright infringement has occurred in a digital work, a court must focus on the work "as presented to, and perceptible by, the user."). WhenU pop-up advertisements modify the visual (on-screen) display of the underlying websites upon which the WhenU pop-up advertisements are triggered to be displayed as follows. The PC user's screen is comprised of rows and columns of dots, which are also known as picture elements or "pixels." Each pixel is ordered in response to computer code that is stored in the frame buffer of a computer's video memory. When the PC user requests to view the Plaintiffs' Websites on their computer screen, each pixel that makes up the computer's on-screen display is ordered to appear as a certain color or intensity, which together create the image of the Plaintiffs' Websites, as viewed by the user on their computer screen.

33.     WhenU causes a modification of the PC user's on-screen display, as stored in the PC's video memory frame buffer, which in turn causes a re-assignment of the pixels on the user's computer screen. From the perception of the PC user, this re-ordering of pixels causes a modification of the Plaintiffs' website. Such a modification creates an unauthorized derivative work.

34.     WhenU's pop advertisements do not actually overlay the Plaintiffs' web pages. Because a PC screen is two dimensional, it has only a single on-screen display -- not multiple

screens in some way stacked above and below each other. (In this respect, three dimensional analogies to billboards and the like are wholly inapposite.) Examining the actual functionality of WhenU's software, directory, and control code, it is clear that WhenU transmits specific instructions to a PC as to advertisements to be displayed. WhenU conveys those instructions to the PC's operating system, commanding that the PC show popup advertisements that override Plaintiffs' copyrighted web page code and that modify the video memory of the PC in order to change the resulting display of Plaintiffs' web pages. Thus, when WhenU advertisements are displayed, WhenU's software actually replaces a portion of Plaintiffs' web pages with WhenU's advertisements.

35.     Plaintiffs have not given WhenU permission to place pop-up advertisements on the Plaintiffs' Websites.

36.     WhenU's advertising scheme deprives Plaintiffs of their right to "have control over the context and manner in which [the copyrighted] work is presented," *Nat'l Bank of Commerce,* 503 F. Supp. at 544, and infringes Plaintiffs' exclusive right to prepare derivative works.

### *WhenU Infringes Plaintiffs' Exclusive Public Display Right*

37.     Section 106 of the Copyright Act accords a copyright owner the exclusive right "to display the copyrighted work *publicly*." 17 U.S.C. § 106(5) (emphasis added). A display can be public if it is transmitted "to the public." 17 U.S.C. § 101.

38.     WhenU's advertising scheme infringes Plaintiffs' exclusive right to display publicly their copyrighted works. Although Plaintiffs' web pages are displayed on a PC user's computer screen, such a display is subject to the restrictions set forth by the copyright owners. *See* 17 U.S.C. §106. Plaintiffs grant PC users a license to display the website pursuant to certain

terms of use. Those terms of use prohibit any modification of the websites. (Tazelaar Dec. at ¶ 17; Stapp Dec. at ¶ 17). It is well-settled law that any use of a copyrighted work that exceeds the license granted by the copyright owner's intended permission constitutes copyright infringement. *See generally* 3 MELVILLE V. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 10.15[A] (2001).

### *The "Fair Use" Doctrine Is Unavailable*

39.     Fair Use is an affirmative defense that must be proved by the infringer. *See Princeton Univ. Press v. Michigan Document Servs., Inc.,* 99 F.3d 1381, 1390 n. 5 (6th Cir. 1999) *(en banc).*

40.     Section 107 of the Copyright Act sets forth four factors to be considered in determining whether the use made of a work in any particular case is a fair use. These factors to be in considered "shall include: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.

41.     Under Factor 1, WhenU's use of the copyrighted work is clearly for commercial purposes. It is WhenU's use, rather than use by the PC user, that is applicable to this analysis. *See Princeton Univ. Press,* 99 F.3d at 1386. WhenU uses the copyrighted web pages to sell advertising without paying Plaintiffs for the use of their websites and associated goodwill. Thus, Factor 1 argues against a finding of fair use. *See Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 562 (1985) ("The crux of the profit/nonprofit distinction is not

whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price").

42. Under Factor 2, the nature of the copyrighted work is highly creative, thus also arguing against fair use. *See Princeton Univ. Press,* 99 F.3d at 1389.

43. Under Factor 3, the fact that WhenU took the entire copyrighted work indicates that fair use should not apply. *Princeton Univ. Press,* 99 F.3d at 1389-90.

44. Under Factor 4, WhenU's use clearly undermines the Plaintiffs' market for lending services by hijacking consumers to competing lenders. *Princeton Univ. Press,* 99 F.3d at 1386-87. Indeed, because this use is a commercial use under Factor 1, it must be presumed that WhenU undermines Plaintiffs' markets. *See Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 450-51 (1984).

45. An analysis of the fair use factors weighs against a finding of fair use.

46. WhenU has failed to discuss any of these factors, (WhenU Opp. at 19 n.14), and, therefore, has failed to carry its burden.

### Plaintiffs Have Suffered and Continue to Suffer Irreparable Harm

47. In the context of a trademark infringement case, a demonstration of likelihood of success on the merits generally establishes a risk of irreparable harm. *See Wynn Oil Co. v. American Way Serv. Corp.,* 943 F.2d 595, 608 (6th Cir. 1991). "[A] presumption of irreparable harm attaches once the moving party demonstrates a probability of success on the merits." *Pita Delight, Inc., v. Salami,* 24 F. Supp. 2d 795, 799 (E.D. Mich. 1998).

48. Plaintiffs have established a likelihood of success on the merits on their claims of trademark infringement and thus have demonstrated that they have suffered and continue to suffer irreparable harm.

49.     In the context of a copyright infringement case, once the plaintiff establishes a *prima facie* case of infringement, there is a presumption of irreparable harm. *See Ronald Mayotte & Assocs. v. MGC Bldg. Co.,* 885 F. Supp. 148, 153 (E.D. Mich. 1994).

50.     Plaintiffs have established a likelihood of success on the merits on their claims of copyright infringement and thus have demonstrated that they have suffered and continue to suffer irreparable harm.

51.     Plaintiffs' presumption of irreparable harm is not rebutted by WhenU's assertion of Plaintiffs' purported delay in seeking relief. Indeed, if the applicable statute of limitations has not run, there is a strong presumption that Plaintiff's delay is reasonable. *See Tandy Corp. v. Malone & Hyde, Inc.,* 769 F.2d 362, 365-66 (6th Cir. 1985), *cert. denied,* 467 U.S. 1158 (1986). The statutes of limitations has not expired on any of Plaintiffs' causes of action. Accordingly, any delay in seeking this preliminary injunction is *strongly* presumed to be reasonable.

52.     Plaintiffs learned of WhenU's pop-up advertising scheme in the fall of 2002, and filed this lawsuit six months later in the case of Wells Fargo and nine months later in the case of Quicken Loans-- hardly the sort of delay that would be sufficient to rebut the presumption of harm, particularly when that period was spent investigating WhenU's complex, proprietary technology and operating procedures, investigating Plaintiffs' claims, and preparing the appropriate legal papers. *See, e.g., Tom Doherty Assocs., Inc. v. Saban Entm't,* 60 F.3d 27, 39-40 (2d Cir. 1995) (copyright owner's four-month delay in filing suit was caused by reasonable investigation); *Fisher-Price v. Well-Made Toy Mfg. Corp.,* 25 F.3d 119, 124-25 (2d Cir. 1994) (six-month delay before suing for a preliminary injunction was reasonable because the company used the time to research the extent of the infringement.); *King v. Innovation Books,* 976 F.2d 824, 831 (2d Cir. 1992) (eight-month delay before filing for a preliminary injunction in copyright

infringement action was reasonable because of investigation during that time); *Ayers v. Nat'l Bank of Fredericksburg*, No. 3:94CV327, 1994 U.S. Dist. LEXIS 9737, at *13 (E.D.Va. June 10, 1994) (seven-month delay in filing for a preliminary injunction was reasonable); *Rubbermaid Commercial Prods., Inc. v. Contico Int'l., Inc.*, 836 F. Supp. 1247, 1257 (W.D. Va. 1993) (eight-month delay was not substantial and was not enough to defeat a finding of irreparable harm); *Encyclopaedia Britannica Educ. Corp. v. Crooks*, 447 F. Supp. 243, 252 (W.D.N.Y. 1978) (ten-month delay in filing a copyright infringement action did not preclude preliminary relief because the organization and planning of a lawsuit involving multiple plaintiffs and substantial legal claims required time).

53.     Even if Plaintiffs had unreasonably delayed seeking relief, the presumption of irreparable harm cannot be denied to Plaintiffs unless WhenU *also* demonstrates that it has been unfairly prejudiced by the delay. *E.g., TWN Mfg. Co., Inc. v. Dura Corp.*, 592 F.2d 346, 349-350 (6th Cir. 1979) ("Laches alone does not foreclose a plaintiff's right in an infringement action to an injunction . . . [o]nly by proving the elements of estoppel may a defendant defeat such prospective relief."); *SCI Sys., Inc. v. Solidstate Controls, Inc.*, 748 F.Supp. 1257, 1261 (S.D. Ohio 1990) ("Laches arises from an unreasonable delay in enforcing one's rights which materially prejudices the alleged infringer.") (citing *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 356-66 (6th Cir. 1985)). As one commentator has noted, "[t]he burden of proving prejudice is heavy and defendants rarely meet it." II P. Goldstein, *Copyright: Principles, Law and Practice* 174 (1989).

54.     WhenU failed to allege or present evidence of any prejudice caused by Plaintiffs' purported delay.

### An Injunction Will Not Substantially Harm WhenU

55.      WhenU claims that it has already lost a number of advertising clients out of
concern that further use of WhenU's advertising services will embroil them in litigation. Despite
the fact that WhenU's CEO Avi Naider claims that WhenU is "on pace to sell about $60 million
in advertising this year," (*See,* Bob Tedeschi, *E-Commerce Report: Legal Battles pit online
advertising companies that create pop-up ads against the owners of Web sites,* NY TIMES, July
7, 2003 at C6 (attached to Barrier Dec. as Ex. D), WhenU further claims that an injunction
would threaten WhenU's ability to obtain new advertisers. Aside from the highly speculative
nature of these future claims, and the fact that lost revenues are compensable by money damages,
any loss of advertising clients as a result of the filing of this lawsuit and corresponding negative
press about WhenU *predates* issuance of an injunction. It is well established that, with respect to
the balance of hardships test, a party cannot rely on harm that has already occurred. *E.g. PBV,
Inc. v. Rossotti,* 178 F.3d 1295, 1999 WL 220123 at *3 (6th Cir. 1999) (attached to Barrier Dec.
at Ex. G); *Meador v. New Times, Inc.,* 36 F.3d 1103, 1994 WL 507594 at *3 (9th Cir. 1994)
(attached to Barrier Dec. at Ex. H); *Thournir v. Buchanan,* 710 F.2d 1461, 1463 n.2 (10th Cir.
1983); *Marcy Playground, Inc. v. Capitol Records, Inc.,* 6 F. Supp.2d 277, 281 (S.D.N.Y. 1998).

56.      The preliminary injunction sought by Plaintiffs is limited to two (2) websites.
This relief would hardly jeopardize WhenU's business. Moreover, the threat that issuance of an
injunction may jeopardize an alleged infringer's business is not cognizable in the balance of
hardship tests, when the business that might be lost is based on infringing activity. *E.g.,
Concrete Mach. Co, Inc. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 612-13 (1st Cir. 1988)
("It would be incongruous to hold that the more an enterprise relies on copyright infringement
for survival, the more likely it will be able to defeat the copyright owner's efforts to have that

activity immediately halted."); *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983).

57.     There is no public policy interest in *confusing* comparative advertising. *See, e.g.*, *Oral-B Labs, Inc. v. Mi-Lor Corp.*, 810 F.2d 20, 24 (2d Cir. 1987) (comparative advertising enjoined when confusion likely).

58.     WhenU's software program already contains a "suppress" list of domain names upon which advertisements are not to be shown. (Edelman Dec. at ¶¶ 33-38). WhenU can easily modify this list to include the Plaintiffs' websites. (Edelman Dec. at ¶¶ 33-38).

59.     WhenU's reliance on the First Amendment is misplaced. Courts have "repeatedly rejected First Amendment challenges to injunctions from copyright infringement on the ground that First Amendment concerns are protected by and coextensive with the fair use doctrine." *Nihon Keizai Shimbun, Inc., v. Comline Bus. Data, Inc.*, 166 F.3d 65, 74 (2d Cir. 1999). *See also Harper & Row Publishers Inc. v. Nation Enters.*, 471 U.S. 539, 556 (1985) (First Amendment concerns have no independent significance in copyright cases because the idea/expression dichotomy "strikes a definitional balance between the First Amendment and the Copyright Act"); *L.A. News Serv. v. Tullo*, 973 F.2d 791, 795 (9th Cir. 1992) (same); *Eldred v. Reno*, 239 F.3d 372, 375 (D.C. Cir. 2001) (the "regime of copyright itself respects and adequately safeguards the freedom of speech protected by the First Amendment.").

### Issuance of An Injunction is in the Public Interest

60.     Courts employing the four factor test for issuance of a preliminary injunction recognize as "'virtually axiomatic' that a temporary injunction will promote the public interest where the plaintiff has established a likelihood of success on the merits." II P. Goldstein,

COPYRIGHT: PRINCIPLES, LAW AND PRACTICE 266 (1989). This is because there is a significant public interest in protecting the intellectual property laws and the investments made in reliance on those laws. *See, e.g., Lasercomb Am., Inc. v. Reynolds,* 911 F.2d 970, 976-77 (4th Cir. 1990).

61.     The public interest also is served by preventing confusion and deception: "[t]he public clearly has a strong interest in truthful marketing." *McNeil-PPC, Inc. v. Guardian Drug Co.,* 984 F. Supp. 1066, 1074 (E.D. Mich. 1997). Indeed, issuance of a preliminary injunction serves the public by eliminating a source of confusion caused by WhenU's pop-up advertising scheme. *Pita Delight, Inc.,* 24 F. Supp.2d at 802.

62.     When WhenU displays an advertisement, it sends to its servers information about the specific URL a user was viewing prior to WhenU's display of the advertisement at issue. In this message to WhenU servers, WhenU also sends the information about the user's location as well as the user's IP address. WhenU software transmits this information to its servers as to all web sites that trigger its advertisements. It does so without regard for the privacy policies of the underlying sites. To the extent that a user has established expectations of privacy based on their relationship with the Plaintiffs' websites, WhenU's actions defeat those expectations.

63.     Because WhenU's advertising scheme causes public confusion, the public interest would be served by granting a preliminary injunction and preventing continued confusion and deception. This is particularly true when the customer is relying upon the Plaintiffs' policies of trust and privacy when electing to interact with the displayed advertisements.

64.     Issuance of an injunction will not compromise the public's use of the Windows environment when accessing the Internet -- only the unauthorized placement of pop-up advertisements on third-party websites will be called into question. Further, consumers will not

be deprived of any savings -- advertisers can simply pay the Plaintiffs to run the same advertisements, assuming they meet the websites' strict standards.

65.     Restricting WhenU's activities would not impact the development of the Internet. WhenU's own applications compete with existing, free applications available elsewhere on the Internet. For example, Atomic Clock Sync 2.6[2] is an automatic computer clock synchronization program, and unlike WhenU's ClockSync, Atomic Clock Sync lacks any popup advertisements. Similarly, Weather Watcher 5.0[3] provides local weather monitoring and reporting, and unlike WhenU's WeatherCast, Weather Watcher lacks any popup advertisements. Accordingly, even if WhenU's software were to cease to be available, users could still obtain the same functionality without financial outlay.

66.     WhenU's targeting model undermines the value of Internet infrastructure, thereby reducing innovation. Numerous legitimate web sites, including many news, financial, weather, and humor sites, support themselves by selling advertising on their own sites. Targeting by WhenU reduces the value of these legitimate sites' on-site advertising, reducing the sites' ability to support their editorial and operational expenses through advertising sales. Furthermore, targeting by WhenU and the resulting advertisements cause users to disfavor the legitimate sites due to the resulting interference. Users therefore tend to avoid the targeted sites and tend not to return to them, further reducing advertisement revenue available to targeted sites.

---

[2] Available at http://www.worldtimeserver.com/atomic-clock/, (last visited July 11, 2003).

[3] Available at http://www.singerscreations.com/, (last visited July 11, 2003).

Respectfully submitted,

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Attorneys for Plaintiffs

By:_____
      Jason Schian Conti (P55617)
32270 Telegraph Road, Suite 225
Bingham Farms, Michigan 48025-2457
(248) 566-8436


Dated: July 14, 2003

## CERTIFICATE OF SERVICE

I certify that on the 14th day of July, 2003, I caused true and correct copies of Plaintiffs'

Proposed Findings Of Fact And Conclusions Of Law to be served by postage prepaid United

States mail upon counsel for Defendant WhenU.com, Inc. at the following addresses:

Leonard M. Niehoff
BUTZEL LONG
350 South Main Street
Suite 300
Ann Arbor, Michigan 48104
(734) 995-3110

Celia Goldwag Barenholtz
Michael D. Paley
Jason M. Koral
KRONISH LIEB WEINER & HELLMAN LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 479-6000

Jason Schian Conti

70250424_3.DOC

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

WELLS FARGO & COMPANY,
a Delaware corporation, WFC HOLDINGS
CORPORATION, a Delaware corporation, and
WELLS FARGO INC., a Michigan corporation,

Case No. 03-71906
Hon. Nancy G. Edmunds

                Plaintiffs,

v.

WHENU.COM, INC., a Delaware corporation,

                Defendant.

_____/

## DECLARATION OF LANE MORTENSEN

I, Lane Mortensen, declare under penalty of perjury that the following is true and correct:

1.    I am Vice President and Compliance Manager - Internet Services Group, of Wells Fargo Bank, National Association.

2.    I make this statement under penalty of perjury, from my own personal knowledge and from my knowledge of business records that I maintain or review in the ordinary course of my employment.

3.    I make this declaration in support of Plaintiffs' Motion For A Preliminary Injunction against Defendant WhenU.com, Inc, filed by Plaintiffs Wells Fargo & Company and WFC Holdings Corporation, (collectively "Wells Fargo").

4.    I first became aware that WhenU was placing pop-up and other advertisements over the Wells Fargo Website in November, 2002

5.     Once I became aware that WhenU was placing pop-up advertisements onto Wells Fargo's website, we began diligently researching the process by which WhenU's SaveNow software operates to deliver pop-up advertisements.

6.     Throughout this period, I worked to discover why WhenU's pop-up advertisements were displayed on some users' PCs, and not on others. As a result of these efforts, I learned that WhenU distributes a software program called "SaveNow" that is downloaded onto a user's PC, and that WhenU's software program causes the delivery of pop-up advertisements when a PC user visits certain websites, including Wells Fargo's website.

7.     Over the next two months, Wells Fargo dedicated resources to better understand WhenU's complex and private technology.

8.     During the winter of 2002, I continued to conduct research. As a result of that research, beginning in January 2003, I began to better understand the financial impact and level of harm to Wells Fargo's reputation and customer goodwill caused by the WhenU pop-up advertisements.

9.     Around February 2003, once I had a better understanding of the impact of WhenU's pop-up advertising scheme, Wells Fargo authorized outside counsel to research and to help Plaintiffs understand the complex legal issues implicated by WhenU's pop-up advertising scheme. As a result of this research, Wells Fargo concluded that WhenU's pop-up advertising scheme was unlawful.

Executed on this 11th day of July, 2003.

Lane Mortensen

2

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

WELLS FARGO & COMPANY,
a Delaware corporation, WFC HOLDINGS
CORPORATION, a Delaware corporation, and          Case No. 03-71906
QUICKEN LOANS INC., a Michigan corporation,       Hon. Nancy G. Edmunds

                     Plaintiffs,

v.

WHENU.COM, INC., a Delaware corporation,

                     Defendant.

_____/

## DECLARATION OF RICHARD CHYETTE

I, Richard Chyette, declare under penalty of perjury that the following is true and correct:

1.     I am Senior Corporate Counsel for Quicken Loans Inc. ("Quicken Loans").

2.     I make this statement under penalty of perjury, from my own personal knowledge and from my knowledge of business records that I maintain or review in the ordinary course of my employment.

3.     I make this declaration in support of Plaintiffs' Motion For A Preliminary Injunction against Defendant WhenU.com, Inc.

4.     Quicken Loans first became aware that WhenU was placing pop-up and other advertisements over the Quicken Loans Website in August 2002

5.     Once Quicken Loans became aware that WhenU was placing pop-up advertisements onto Quicken Loans' website, we began diligently researching the process by which WhenU's SaveNow software operates to deliver pop-up advertisements.

6.    During the fall and winter of 2002, Quicken Loans continued to conduct research and as a result of that research began to better understand the financial impact and level of harm to Quicken Loans' reputation and customer goodwill caused by the WhenU pop-up advertisements.

7.    Throughout this period, Quicken Loans worked to discover why WhenU's pop-up advertisements were displayed on some users' PCs, and not on others.  As a result of these efforts, Quicken Loans learned that WhenU distributes a software program called "SaveNow" that is downloaded onto a user's PC, and that WhenU's software program causes the delivery of pop-up advertisements when a PC user visits certain websites, including Quicken Loans' website.

8.    Over the next several months, Quicken Loans dedicated resources to better understand WhenU's complex and private technology.

9.    Around February 2003, once Quicken Loans had a better understanding of the impact of WhenU's pop-up advertising scheme, Quicken Loans authorized outside counsel to research and to help Plaintiffs understand the complex legal issues implicated by WhenU's pop-up advertising scheme.  Plaintiffs concluded that WhenU's pop-up advertising scheme was unlawful.  Shortly thereafter, this lawsuit was filed.

Executed on this 11th day of July, 2003.

Richard Chyette